UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROXANNE MOYER, INDIVIDUALLY | * | CIVIL ACTION NO: 2:11-3185 |
| AND ON BEHALF OF HER DECEDENT | * | |
| HUSBAND, SAMUEL N. MOYER | * | SECTION: E |
| | * | |
| VERSUS | * | MAGISTRATE DIV.: 2 |
| | * | |
| SIEMENS VAI SERVICES, L.L.C, | * | |
| SIGNAL METAL INDUSTRIES, INC., | * | JURY TRIAL REQUESTED |
| ********************************** | | |

**MEMORANDUM IN OPPOSITION TO SIGNAL METAL INDUSTRY INC. AND SIEMENS INDUSTRY INC.'S *DAUBERT* MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERT FRANK DIETRICH**

MAY IT PLEASE THE COURT:

Now into Court, through undersigned counsel, comes the Plaintiff, Roxanne Moyer, individually, and on behalf of her decedent husband, Samuel N. Moyer, who submits this Memorandum in Opposition to Signal Metal Industries Inc. ["Signal Metal"] and Siemens Industry Inc.'s ["Siemens"] *Daubert* Motions in Limine [R.Doc. 93 and 94], respectively, to exclude Plaintiff's expert, Frank Dietrich. The subject matters of both Motions sufficiently overlap. Therefore, Plaintiff consolidates her opposition to each Motion herein.

The Defendants' Motions should be denied by this Court on the grounds that the expert opinion testimony of Plaintiff's liability expert, Frank Dietrich, is both *relevant* and *reliable* as required by the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). At the outset, the Court should note that Plaintiff has seen fit to retain a single liability expert in this case, Frank Dietrich. However, the Defendants, Signal Metal and

1

Siemens, have offered a total of 6 liability experts[1] to testify on their behalf at trial. As such, the Defendants will certainly have ample opportunity to contradict Mr. Dietrich's opinions with its own experts at trial.

**I.    Introduction**

As fully explained in Plaintiff's Oppositions to Signal Metal and Siemens' Motions for Summary Judgment (R.Doc. 109 & 110), Plaintiff's claims arise under the provisions of the Louisiana Products Liability Act ["LPLA"].[2] The essential facts of this case are not in dispute.

On February 1, 2011, Samuel Moyer, a steel worker, sustained fatal third and fourth degree burns to 100% of his body when an 85-ton steel ladle (pot) filled with 3000°F molten metal erupted, spewing several tons of liquid steel onto Mr. Moyer. The accident occurred at the Arcelor Mittal (previously Bayou Steel) steel processing plant in LaPlace, Louisiana, where Mr. Moyer was employed as a furnace second helper. Mr. Moyer survived for over 30 hours after suffering his burns. He died on February 3, 2011 at the Baton Rouge General Burn Unit.

Before diving into the specifics of this Motion, a brief review of Plaintiff's claims may be in order. Plaintiff's claims against Signal Metal center on its "defective design"[3] of Ladle No. 4 *and* its "failure to provide an adequate warning"[4] that the Ladle, designed and manufactured without auto coupling technology ["AGC"][5] or a lid/cover, posed an unnecessary risk to steel workers being injured in a ladle eruption.

---

[1] For Signal Metal- Former OSHA Administrator, John Henshaw, Metallurgical Engineer, Frank Wisniewski, and Mechanical Engineer, Matt Nousak. For Siemens- Carnegie Mellon University Professor of Metallurgical Engineering, Richard Fruehan, Ph.D., Former Professor of Mechanical Engineering at M.I.T., Stuart Brown, Ph.D., and Siemens Mechanical Engineer, Peter Wimmer.
[2] LA. REV. STAT. ANN. § 9:2800.51, *et seq.*
[3] LA. REV. STAT. ANN. § 9:2800.56
[4] LA. REV. STAT. ANN. § 9:2800.
[5] For a full discussion of AGC technology, Plaintiff refers the Court to her Memoranda in Opposition to Signal Metal's and Siemens' Motions for Summary Judgment. (R.Doc. 109 & 110).

Plaintiff maintains identical LPLA claims against Siemens, though aimed at different products. First, the ladle transfer car manufactured by Siemens possessed a design defect because Siemens failed to incorporate a safer alternative ladle car design that included automatic gas coupling safety features. Also, Siemens failed to provide an adequate warning that its ladle car, without AGC, posed an increased risk of harm to steel workers during a ladle eruption.

Second, the argon stir station that Samuel Moyer was standing on at the time of the ladle eruption was defectively designed in that Siemens failed to install shielding on the platform. This shielding/guarding would have significantly reduced the risk that Mr. Moyer would have been injured by the erupting molten steel. Siemens also failed to provide Bayou Steel (now Arcelor Mittal) an adequate warning that the platform, without shielding, posed an increased risk of harm to steel workers in the event of a ladle eruption.

The Defendants challenge, Metallurgical Engineer, Frank Dietrich, retained by Plaintiff on the basis that: 1) Mr. Dietrich is not qualified to give opinions regarding Plaintiff's LPLA design defect claims,[6] and 2) his opinions are not based on a sufficiently reliable methodology.[7]

Mr. Dietrich's report[8] and testimony should be admitted and the Defendants' arguments fail for two main reasons. First, contrary to the Defendants' assertions, Mr. Dietrich possesses the necessary qualifications to render expert opinion regarding the essential elements of Plaintiff's LPLA claims as expressed in his expert narrative report.

Second, the methodology used by Frank Dietrich to render his opinions is both reliable and valid given that the material and information that form the basis of Mr. Dietrich's opinions are derived from his review of all the discovery documents produced in the case, his personal site

---

[6] *See* R. Doc. 93-1, Signal Metal's *Daubert* Memorandum in Support, p. 1; R. Doc. 94-1, Siemens' *Daubert* Memorandum in Support, p. 2.
[7] *Id*.
[8] Exhibit A, Expert Report of Frank E. Dietrich.

inspection of the LaPlace steel plant on January 28, 2013, and his specific knowledge and experience of over 30 years in the steel manufacturing industry, all of which can be directly applied to assist the trier-of-fact in determining that the Defendants failed to incorporate safer alternative product designs, which directly contributed to the death of Samuel Moyer.

For those two main reasons, Plaintiff respectfully contends that the Defendants' Motions in Limine seeking to bar the testimony of Frank Dietrich should be denied.

Section II, entitled "Applicable Law," sets forth the legal standards pronounced by the U.S. Supreme Court in *Daubert,* which governs this Court's analysis regarding the admissibility of Mr. Frank Dietrich's testimony pursuant to F.R.Evid. 702. Section III outlines the Qualifications of Frank Dietrich, which satisfy the requirement of Rule 702 that Mr. Dietrich be qualified, *inter alia*, by knowledge, skill, or experience. In Section IV, Plaintiff applies the *Daubert* analysis of "reliability" and "relevance" to the opinions formed by Plaintiff's Liability Expert, Frank Dietrich, now being questioned by the Defendants.

**II.    Applicable Law**

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.[9] *Daubert* requires that "when expert testimony is offered, a trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."[10] Rule 702[11] of the Federal Rules of Evidence provides that "an expert witness 'qualified by **knowledge, skill, training or education**,' may testify when 'scientific, **technical or other**

---

[9] *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993); *Kumho Tire Co., v. Carmichael* , 526 U.S.137 (1999).
[10] *Watkins v. Telesmith Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997.)
[11] FED R. EVID. 702 states: " A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

4

**specialized knowledge'** will assist the trier-of-fact to understand the evidence or to determine a fact issue."[12]

The trial judge is responsible for ensuring that the proposed testimony is supported by "good grounds."[13] The Fifth Circuit has made clear that "*Daubert*, however, did not work a 'sea change over federal evidence law,' and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[14] The Court in *Daubert* stated:

> **Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.**[15]

Finally, this district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[16] Notwithstanding *Daubert*, Courts should remain cognizant that the rejection of expert testimony is the exception and not the rule.[17]

### III. Frank Dietrich is Qualified to Render Opinions in this Litigation

An expert assists the trier-of-fact when s/he "can bring to the jury more than the lawyers can offer in argument."[18] The focus of *Daubert* is not on qualifications, however, but on reliability.[19] In the Fifth Circuit, "[a]s long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function."[20]

The Defendants' primary argument that Mr. Dietrich is unqualified to render opinions in this case rests on the fact that he is not an expert in mechanical engineering or product design

---

[12] *McGhee v. Pride Offshore, Inc.*, 2008 WL 2597925, p. 2 (E.D. La. 2008) (Emphasis added.)
[13] *Daubert,* 509 U.S. at 590.
[14] *Betts v. General Motors Corp*., 2008 WL 2789524 *3 (N.D. Miss. 2008) *quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996.)
[15] *Daubert,* 509 U.S. at 595.
[16] *General Electric* Co. *v. Joiner ,* 522 U.S. 136 , 138 -39 (1997) ; *Seatrax Inc. v. Sonbeck Int'l Inc.,* 200 F.3d 358 , 371 (5th Cir. 2000).
[17] *Johnson v. Samsung Electronics America Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) *discussing* FED R. EVID. 702 Advisory Committee Notes to Amendments.
[18] *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986.)
[19] *Betts v. General Motors Corp*., 2008 WL 2789524 *11 (N.D. Miss. 2008).
[20] *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999.)

engineering.  The Defendants' arguments fail because they seek an application of *Daubert* that is far too rigid.  As shown below, Mr. Dietrich, though not a mechanical engineer or product design engineer, is uniquely qualified to render opinions in this case based on his education, skill, experience and the fact that he is the only expert in this case that has actually installed and used AGC technology in the real world.

Frank Dietrich has worked in the steel manufacturing industry since 1977 when he began his career as a Melter Foreman at Bethlehem Steel Corporation-Steelton Plant ["Bethlehem"].[21] Mr. Dietrich's career in the steel manufacturing industry began after he earned his Bachelor of Science Degree and Master of Science Degree in the field of Metallurgical Engineering from Virginia Tech in Blacksburg, Virginia.[22]  After earning his Master's Degree, Mr. Dietrich immediately began working as a Melter Foreman for Bethlehem Steel and remained employed at that steel-making facility for over 20 years.[23]

During his employment with Bethlehem, Mr. Dietrich received numerous promotions. In 1987, Mr. Dietrich held the job of General Foreman for Continuous Casting.[24]  In 1995, he became the Assistant Superintendent for Bethlehem Steel Melt Shop, a position he held until 1998.[25]  From 1998 to 2000, Mr. Dietrich worked as Plant General Manager for Hoeganaes Corporation, which is an electric arc furnace based powder metal facility.[26]  From 2000 to 2006, Mr. Dietrich worked as a steel industry consultant and sold refractories, which are heat-resistant materials used in steel-making.[27]

---

[21] Exhibit B, CV of Frank Dietrich, p. 2.
[22] *Id*.
[23] *Id*.; *see also*, Exhibit C, Deposition of Frank Dietrich, p. 295-296.
[24] Exhibit C, Frank Dietrich, p. 299.
[25] *Id*. at 299-300.
[26] *Id*. at 300.
[27] *Id*. at 300-301; *see also* Exhibit B, CV of Frank Dietrich.

6

Mr. Dietrich's knowledge, experience, training, and education will assist the trier-of-fact in the present case. During his career with Bethlehem Steel, Mr. Dietrich was personally responsible, in 1993, for acquiring auto coupling technology for use on the steel ladles and ladle cars at that facility.[28] Mr. Dietrich also designed components of the auto coupling technology specifically aimed at insuring proper mating of the AGC system at the Bethlehem Steel Plant.[29] Once installed, "the device performed flawlessly and proved to be reliable in these steel mill conditions."[30]

In addition, Mr. Dietrich personally observed auto coupling technology in use in Europe before 1986. From 1981 to 1986, Mr. Dietrich went to Europe to evaluate new steel making technologies on five separate occasions.[31] These trips were part of a project specific to a European supplier that was designing equipment for use in Mr. Dietrich's Bethlehem Steel plant.[32] Frank Dietrich was assigned to approve designs and oversee the erection of equipment.[33] During his third visit in 1985, Mr. Dietrich was introduced to, and personally observed, auto coupling systems at the Thyssen Krupp Stahl plant in Dartmond, Germany.[34]

Also, Mr. Dietrich served as Vice Chairman of the Globetrotters Section of the Iron & Steel Society of the American Institute of Mining, Metallurgical, and Petroleum Engineers (AIME).[35] During his vice chairmanship, Mr. Dietrich traveled to several steel plants to discuss

---

[28] Exhibit C, Frank Dietrich, pp. 142-143, 330-331
[29] *Id*. at pp. 90-91.
[30] Exhibit A, Dietrich Report, p. 7.
[31] *Id*. at pp. 6-7.
[32] *Id*.
[33] *Id*.
[34] *Id*. The auto coupling system in Germany was not on a transfer car. However, the same auto coupling technology and equipment can also be placed on other stations, such as ladle stands and ladle metallurgy furnaces (LMF). Therefore, the fact that the auto coupling device was not on a ladle car is not dispositive. *See* Exhibit G, Siemens Corporate Designee Peter Wimmer, pp. 63-64. (stating "It is the same technology for steel cars as it is for steel stations," which includes ladle furnaces.)
[35] Exhibit B, CV of Frank Dietrich.

and observe auto coupling technology.[36] These plants included- Colorado Fuel and Iron, ARMCO, Chaparral Steel, Jersey Steel-Raritan River, Defasco/Stelco, and Nucor Steel Arkansas.[37] These visits occurred during the time frame of 1990, when Mr. Dietrich, on behalf of Bethlehem Steel was considering the adoption of the auto coupling technology. The reason for these visits was that in the steel manufacturing industry "getting dirty…and seeing how the system worked is the best way to find out what type you're going to select."[38]

With regard to the issue of ladle lids/covers, Mr. Dietrich has designed ladle covers/lids for Bethlehem Steel in 1980.[39] These ladle covers were for 150-ton ladles.[40]

The Defendants are correct that Mr. Dietrich has not published any books or articles or other publications about AGC technology or the products in this case.[41] However, neither have any of the other experts in this case. Notably, Siemens has retained Metallurgical Engineer and Professor at Carnegie Mellon University, Richard Fruehan, Ph.D., as an expert in the case. In his deposition, Dr. Fruehan stated that he considered himself the world's leading expert in steel manufacturing processes.[42] Dr. Fruehan has published over 300 papers and 4 books on steelmaking, but none of these publications address auto coupling technology.[43] Since *the* most renowned expert in the industry has not published on the issue of auto coupling, evidently, this equipment is not a "hot topic" in the steel manufacturing world. Therefore, the aspersions cast at Mr. Dietrich for not being published on the issues in this case should be of no moment to the Court.

---

[36] Exhibit C, Frank Dietrich, pp. 150-154.
[37] *Id*. at p. 154-156.
[38] *Id*. at pp. 155-156.
[39] *Id*. at 387-388.
[40] *Id*.
[41] R.Doc. 93-1, Signal Metal's Motion *in Limine* Memorandum in Support, p. 3.
[42] Exhibit D, Deposition of Richard Fruehan, Ph.D., pp. 12-13.
[43] *Id*. at 35.

Finally, due to his knowledge, education, experience, and skill detailed above, Mr. Dietrich holds himself out as steelmaking process engineer which includes:

> Running a steel mill, running a steel mill from a steelmaking operation side. Where my knowledge base would stop, would stop at the entrance of the scrap area. And that equipment and the operation of it, I claim to be very proficient in it, including all the types of new designs for furnaces and so forth.[44]

In sum, Mr. Dietrich has extensive experience observing steel plants with AGC technology. Mr. Dietrich also has the unique personal experience, which none of the defense's experts have, of actually installing and using AGC, which Mr. Dietrich carried out at Bethlehem Steel in 1993. Given his knowledge, education, skill, and technical experience, Plaintiff has carried her burden of showing that Mr. Dietrich is reasonably qualified to render opinions in this case.

### A. Frank Dietrich is Not an Advocate

Given the legal issues, the complexity of the facts, and the other more legitimate arguments that should occupy the thoughts and time of the Defendants in litigating this tragic case, the Defendants slip into making credibility arguments not even remotely aimed at satisfying any element under *Daubert*. Does the fact that Mr. Dietrich wrote a paragraph on an internet blog render his opinions unreliable *per se*? No.

It is nothing more than vitriol argument in a case of this magnitude for the Defendants to assume that Plaintiff's choice of expert hinged on a "blog" posting that provided ground-breaking legal doctrine, such as that the victim's employer is immune from suit under worker's compensation laws, and that other entities, such as equipment designers, may be responsible. In the minds of the Defendants, this sort of cutting edge legal advice dispensed on the internet over

---

[44] Exhibit C, Frank Dietrich, pp. 319-320.

the course of two minutes surely sealed the deal that Mr. Dietrich would be retained in this case to render each of the opinions expressed in his narrative report.

Stating obvious legal doctrine on a website does not make Mr. Dietrich an advocate for any side. If the Defendants wish to use such evidence to probe his credibility at trial, then so be it. However, these arguments are not the proper subject of a *Daubert* Motion in Limine. Mr. Dietrich discussed his posting in his deposition and that this posting did not result in an immediate agreement to be a testifying expert in the case. Mr. Dietrich stated: "the agreement [with Plaintiff] was that I was to look at things first. I wasn't committing to anything. I knew very little about it. So I'm certainly not going to sign up to do a job when there's no job to be done. I didn't know the extent. I didn't know the circumstances."[45] In sum, Mr. Dietrich did not form any opinions in this case until he had reviewed all of the materials, and he is not an advocate.

The cases cited by the Defendants are completely inapposite. In *Perry v. U.S.*, the Eleventh Circuit upheld a district court's decision to exclude an epidemiologist, Dr. Goldfield, who was retained in the case to present evidence of a statistical relationship between encephalitis and the swine flu vaccine.[46] The Court's main criticism of Dr. Goldfield, who is *not* a neurologist, was that he "re-diagnosed" a number of cases in his statistical database as encephalitis, without proper justification.[47] Rightly so, the district court and Eleventh Circuit found that Dr. Goldfield's "re-diagnosis" of cases really meant that he had manipulated his research and had "formed opinion to the answer he is going to find before he even begins his research."[48] Other courts had found Dr. Goldfield's methodology troubling as well.[49]

---

[45] Exhibit C, Frank Dietrich, pp. 60-61.
[46] *Perry v. U.S.*, 755 F.2d 888, 891 (11th Cir. 1985.)
[47] *Id.* at 892.
[48] *Id.*

However, Mr. Dietrich's blog-posting is not nearly as egregious as the facts of *Perry* cited by the Defendants. Defendants present no evidence that Mr. Dietrich had formed any opinions regarding AGC technology, ladle lids/cover, or shielding/guarding, which are the issues in this case, at the time he made his blog-posting. To suggest that Mr. Dietrich "stacked the deck," as Dr. Goldfield apparently did, in making his vague October 2011 blog-posting, goes too far. Therefore, the Court should not give undue influence to Defendants' advocacy arguments.

### IV. Frank Dietrich's Opinions and Methodology are Reliable.

The test of reliability in *Daubert* is flexible.[50] "To put it another way, *Daubert* does not 'require all experts in every case to back his or her opinion with independent tests that unequivocally support his or her conclusions.'"[51] Though an expert must go beyond "conceptual suggestions" in proposing an alternative design, there is no requirement that the expert actually design, produce, and test their proposed design on the specific product at issue.[52] As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.[53]

Time and again, the Defendants argue that Mr. Dietrich did not do any testing or calculations or scientific analysis. However, Mr. Dietrich's methodology is sufficiently reliable because his opinions are developed from the specific facts of this case, his industry experience, and his site inspection of the Laplace steel mill.

---

[49] *Id*. (explaining: Several of the courts which have heard his testimony in other swine flu cases have criticized the effect of this predisposition on his research. *See e.g., O'Gara v. United States,* 560 F.Supp. 786, 790 (E.D.Pa.1983) ("... Dr. Goldfield's analysis seems to me to be marked by a tendency to select figures and assumptions ... which will lead to the conclusion that the relative risk in the immunized population remains significantly elevated"); *Robinson v. United States,* 533 F.Supp. 320, 328 (E.D.Mich.1982) ("[Dr. Goldfield] uses calculations that are constructed so as to prove his hypothesis").
[50] *Johnson v. Samsung Electronics America Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011).
[51] *Id*. quoting *More, JB, Inc. v. Nutone Inc.*, 2007 WL 4754173 at *12 (W.D. Tex. 2007.)
[52] *Guy v. Crown Equipment Co.*, 394 F.3d 320, 327 (5th Cir. 2004.)
[53] *14.38 Acres of Land,* 80 F.3d at 1077 (*quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987.)

In fact, each of the "Expert Opinions" discussed by Mr. Dietrich on pages 16-23 of his report are based on the following: 1) Site Inspection of the Arcelor Mittal/Bayou Steel plant in January 2013; 2) over 30 total years of experience employed in the steel manufacturing industry; 3) his personal observation of AGC technology in steel plants around the world and in the U.S.; 4) his personal experience researching, installing, and using AGC equipment at his Bethlehem Steel-Steelton plant; 5) his review of all of the documents produced during discovery, including engineering drawings of AGC technology from Signal Metal and SES Engineering, as well as, the AGC and ladle lid/cover patents ; 6) and his review of all of the depositions taken in the case particularly those of Signal Metal's Ed Dee and William Mann, Siemens' Peter Wimmer and Johannes Rosner, and all of Bayou Steel/Arcelor Mittal Employees.[54]

### A. Mr. Dietrich's Opinions that the ladle and ladle car should have incorporated AGC are not "Equivocal."

First, Signal Metal argues that Mr. Dietrich's opinion that the ladle should have included AGC and lids/covers is unreliable partly because the Association for Iron and Steel Technology's ["AIST"] Technical Report No. 9 [TR-9], an industry guidance for the design of steel ladles, does not require or mention AGC or ladle lids.[55] This is true. However, the TR-9 report is not an industry requirement or mandate. The report is a guide only. TR-9 specifically states in its Disclaimer:

> **[T]his report does not represent either minimum acceptable standards or mandatory specifications….[t]he use of language in this report that might be construed as mandatory is intended only to preserve the integrity of the report as the committee views it. It is not intended to require strict compliance where not necessitated by safety or operational needs.**[56]

---

[54] Exhibit A, Dietrich Report, p. 23.
[55] R. Doc. 93-1, p. 8.
[56] Exhibit E, AIST Technical Report No. 9 [Signal Metal 1-2].

12

The fact that Frank Dietrich's opinions incorporate AGC and lids/cover that are not mentioned in TR-9 does not cast doubt on the reliability of his opinions. This is especially so given that Signal Metal admitted in discovery that it has incorporated AGC onto ladles and has built ladle lids/cover in past.[57] Signal Metal had the ability to design and indeed built these devices even though TR-9 does not require them or mention them. Therefore, any argument that Mr. Dietrich's opinions lack reliability due to the omission of AGC and lids/overs in the TR-9 is clearly misplaced.

Second, Signal Metal parses through the 414 pages of Frank Dietrich's deposition, which lasted in excess of 8 hours, in order to focus on the word-"Somewhat"- which it argues must require the exclusion of his opinions. Mr. Dietrich was asked: "Q: …[D]o you believe that the absence of an accommodation [for AGC] on the ladles supplied by the Signal Metal to Bayou Steel in 2005 renders the ladles defective? A: Somewhat."[58] Signal Metal takes this Answer out of context.

Mr. Dietrich's report is clear that the Signal Metal ladle was unreasonably dangerous by design when it left their control in 2005.[59] The *reliable basis* for this opinion is the fact that "Though Signal Metal had incorporated AGC technology on its ladles in the past, Signal Metal made no effort in its design review meetings to address the risk of ladle eruptions injuring steel workers who used Signal ladles."[60] These facts were part of the sworn deposition testimony of Signal Metal employees and serve as reliable basis for Mr. Dietrich's opinions.

Signal Metal chooses to highlight only certain portions of Mr. Dietrich's testimony. Though he admitted theoretically a manual coupling system could be safely designed, Mr.

---

[57] R. Doc.109, Plaintiff's Memorandum in Opposition to Signal Metal's Motion for Summary Judgment, pp. 5, 7.
[58] R. Doc. 93-1, p. 8.
[59] Exhibit A, Dietrich Report, p. 19.
[60] *Id.* at 19.

Dietrich clearly stated, "but until you do all that, you might as well do automatic coupling."[61]  In Mr. Dietrich's opinion, AGC technology is clearly superior to manual coupling.  His opinion is based on his personal experience of installing AGC at the Bethlehem Steelton plant.  With regard to his reasons for choosing AGC over manual coupling, Mr. Dietrich clearly explained:

> **Q:  And why did you feel at that time there was no other way to go?**
>
> **A: I've said in the report and it's still…I don't believe employees should ever be placed in a situation where they're below an untreated ladle of steel for the reasons that…, we see here….[t]he only point in time I feel that you put…people in harm's way is when the risk is miniscule, and that would be after the ladle is fully treated.[62]**

Third, Siemens, as it does in its Motion for Summary Judgment, takes issue with the fact that "Plaintiff's expert conceded during his deposition that the argon stir station was defective with or without shields."[63]  Siemens also states, "[Frank Dietrich] testified that automatic coupling technology on the ladle car-as opposed to shields on the argon stir station- would render the argon stir station non-defective."[64]  Siemens is confused.

The undisputed testimony in this case is that AGC technology would have eliminated the need for Mr. Moyer to disconnect the stir hose, which is the task that placed him in such dangerous proximity to the ladle during the eruption.[65]  With AGC technology, Mr. Moyer would have no need to be on the stir station platform at all.  Shielding is not necessary on the platform if AGC technology eliminated the need for anyone to work on that platform.  Frank Dietrich is simply making a common sense argument in the alternative, i.e. design a ladle car with AGC technology; if not, design a stir platform with shielding.  Even Siemens' own expert agreed that AGC technology would eliminate the need for shielding because there would be no

---

[61] Exhibit C, Frank Dietrich, pp. 88-89.
[62] Exhibit C, Frank Dietrich, pp. 333-334.
[63] R. Doc. 92-1, Siemens' Memorandum in Support, p. 23.
[64] *Id*.
[65] Exhibit D, Richard Fruehan, Ph.D., p. 62.

reason for a steel worker to manually connect/disconnect the stir hose.[66] Frank Dietrich's testimony and opinions are reliable because it is a common sense argument in the alternative.

Fourth, the Defendants attack Mr. Dietrich's statements that AGC technology is an industry-proven solution. The Defendants argue that Mr. Dietrich's statement is unreliable because he lacks "control documents, tests, or any other document indicating that Automatic coupling systems worked safely or effectively, but is based on a few observations of automatic gas coupling technology at a facility in Germany where he was 'told' that technology was 'working great.'"[67] Once again, the Defendants choose to tell only half the story.

The Defendants fail to mention that Mr. Dietrich served as Vice Chairman of the Globetrotters Section of the Iron & Steel Society of the American Institute of Mining, Metallurgical, and Petroleum Engineers (AIME).[68] During his vice chairmanship, Mr. Dietrich traveled to several steel plants to discuss and observe auto coupling technology.[69] These plants included- Colorado Fuel and Iron, ARMCO, Chaparral Steel, Jersey Steel-Raritan River, Defasco/Stelco, and Nucor Steel Arkansas.[70] These visits occurred during the time frame of 1990, when Mr. Dietrich, on behalf of Bethlehem Steel was considering the adoption of the auto coupling technology. The reason for these visits was that in the steel manufacturing industry "getting dirty…and seeing how the system worked is the best way to find out what type you're going to select."[71] Mr. Dietrich's extensive professional experience in the industry puts him in a unique position to opine that AGC technology is an industry proven solution.

Regarding the existence of AGC technology before 1986, Mr. Dietrich's opinion that the designs existed is based on the methodology of having relied on his personal observation of the

---

[66] *Id.* at 104-105.
[67] R. Doc. 93-1, p. 11.
[68] Exhibit B, CV of Frank Dietrich.
[69] Exhibit C, Frank Dietrich, pp. 150-154.
[70] *Id.* at p. 154-156.
[71] *Id.* at 156.

15

equipment in Germany in 1984, and the fact that Siemens admitted in discovery that "the principles of AGC technology, the general machinery, and the equipment" had been around for years before 1986.[72]

Fifth, the Defendants argue that Mr. Dietrich's opinions that Signal Metal should have incorporated a ladle lid/cover onto its ladle are unreliable. Mr. Dietrich's opinions in this regard are indeed reliable because he has personally designed ladle lids/covers.[73] In addition, Mr. Dietrich clearly explained that the reason he gives the opinion that ladle/lids were a common sense safety option in this case is based on his personal inspection of the Plant:

> **Based on my observations yesterday and based on the fact that I see a ladle cover being a very simple device that's suspended by an overhead crane, I checked the ladle crane, the ladle crane had a hook which would have easily been able to lift a lid on and off, and that's how they were placed on top of the idle lids that were sitting in the facility yesterday. Mr. Taylor's reasons for saying it elude me. This is not a very complicated device. There are also more, let's say, advanced designs that you don't even touch them with a crane. So I even heard some rumbling yesterday on the tour about that, so -- from a Bayou Steel employee. So I don't know. I mean, when you first are asked a question about would it work, I mean, looking at yesterday what I saw, the answer, common sense would have been "yeah."[74]**

Mr. Dietrich is not alone in his opinion that a ladle lid/cover would be feasible in the Laplace steel mill. Signal Metal's expert, Matt Nousak, testified that based on his inspection of the facility it would be possible to arrange a ladle lid onto the ladle during the stirring process using the plant's cranes.[75] Mr. Dietrich's industry experience and personal inspection of the plant are reliable methods to arriving at his opinion that the incorporation of a ladle lid/cover at the Bayou Steel plant would have worked.

---

[72] R. Doc.110, Plaintiff's Memorandum in Opposition to Siemens' Motion for Summary Judgment, p. 5, 22-24.
[73] *Id.* at 387-388.
[74] *Id.* at 386-387.
[75] Exhibit F, Deposition of Signal Metal Mechanical Engineer, Matt Nousak, p. 102.

Also, Mr. Dietrich renders the opinion that the ladle lid/cover would have aided in minimizing the amount of steel that escaped in the eruption. This opinion is based on his personal experience when he has inspected steel facilities that use ladle lids during violent stirring to contain the steel and slag in the ladle in the event of a ladle eruption.[76] Mr. Dietrich was unable in the present case to make a specific calculation, if a specific calculation could indeed be made, regarding whether a lid/cover would have completely blocked the ladle eruption. However, Mr. Dietrich is not required to test his theory in order for his opinion to satisfy *Daubert*.[77] Rather, Mr. Dietrich relied on his review of the video footage that partially captured the ladle eruption on February 1, 2011,[78] his inspection of the facility,[79] his experience designing ladle lids, and his decades of experience in the field. Notably, the Defendants criticize Mr. Dietrich for not making calculations on this issue when the Defendants' own experts also did not run any tests or make calculations on this issue.

Finally, Mr. Dietrich should be allowed to render opinions that Signal Metal did not provide an adequate warning that its ladle, without AGC or lids/cover, posed an unnecessary risk to steel workers during a ladle eruption.[80] Due to his vast steel processing experience at Bethlehem steel, Mr. Dietrich is uniquely situated, from the point-of-view of the customer/steel plant, to assist the trier-of-fact in determining that Signal Metal should have issued a warning. Specifically regarding Signal Metal, Mr. Dietrich explained that:

> During the design phase, your [Signal Metal] engineers should have been there, assessing the situation, saying, "Whoa, guys. You know, you're living in prehistoric days. You've got to use automatic coupling here. It's an unsafe condition. I'm not even going to supply a ladle to you.[81]

---

[76] Exhibit C, Frank Dietrich, pp. 249-250.
[77] *Johnson v. Samsung Electronics America Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011).
[78] Exhibit C, Frank Dietrich, pp. 253-254.
[79] *Id.* at 386-387.
[80] The Court should note that Siemens does not challenge, based on *Daubert*, Mr. Dietrich's opinions as to the inadequacy of Siemens' 1996 ladle eruption warning letter sent to Bayou Steel. Therefore, that item is omitted.
[81] Exhibit C, Frank Dietrich, pp. 365-366.

Mr. Dietrich's opinion is based on the deposition testimony of Signal Metal, particularly William Mann and Ed Dee. In his expert report, Mr. Dietrich chronicled Mr. Mann and Mr. Dee's testimony in great detail.[82] This deposition testimony contains grave admissions made by Signal Metal (itemized on pages 9-13 of his expert report).[83] These statements provide a reliable basis for Mr. Dietrich's opinion that Signal Metal did not provide an adequate warning in that its ladle, without AGC or lids/cover, posed an unnecessary risk to steel workers during a ladle eruption.

### V. Frank Dietrich Will Not Offer Opinion Testimony on Siemens' Corporate History or Conduct.

Therefore, Section 2(C) of Siemens' Memorandum in Opposition, p. 15 is MOOT. Also, Mr. Dietrich will not render any opinions as discussed by Siemens in R. Doc. 94-1, p. 5, fn. 1.

### VI. Frank Dietrich Will not Offer Legal Opinions or Testimony on "Legal Liability," but only discuss the facts of the case and his opinions that support the elements of Plaintiff's LPLA claims.

Therefore, Section 2(D) of Siemens' Memorandum in Opposition, R. Doc. 93-1, p. 17 and Section D(2) of Signal Metal's Memorandum in Opposition, R. Doc. 93-1, p. 17 is MOOT.

### VII. Conclusion

In sum, the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[84] The Court in *Daubert* stated:

> **Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.[85]**

---

[82] Exhibit A, Dietrich Report, pp. 9-13.
[83] *Id*.
[84] *Betts v. General Motors Corp.*, 2008 WL 2789524 *3 (N.D. Miss. 2008) *quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996.)
[85] *Daubert,* 509 U.S. at 595.

18

Plaintiff has shown that Frank Dietrich is qualified to render the opinions stated in his expert narrative report, and these opinions are based on a sufficiently reliable methodology. Frank Dietrich's methodology is rooted in decades of industry experience, his personal inspection of the accident location and equipment in this case, his personal experience installing AGC equipment and researching its use in numerous plants worldwide, and finally, his review of all the documents produced in this litigation.

There is no doubt that the Defendants disagree with Mr. Dietrich's opinions. Plaintiff expects that this is the reason that the Defendants have seen fit to retain a total of 6 liability experts to refute the opinions of one man.

Based on all of the arguments herein, Plaintiff respectfully requests that the Defendants' Motions (R. Doc. 93 & 94) should be denied.

Respectfully submitted,

**DAVIS, SAUNDERS & MILLER, PLC**

/s/ *Joseph M. Miller*

**JOSEPH M. MILLER (#30636)**
**BENJAMIN B. SAUNDERS (#11733)**
**CARISA GERMAN-ODEN (#31463)**
400 Mariners Plaza Drive, Suite 401
Mandeville, LA 70448
Telephone:  (985) 612-3070
Facsimile:  (985)612-3072
**Attorneys for Plaintiff, Roxanne Moyer,**
**Individually and on Behalf of her Decedent**
**Husband, Samuel N. Moyer**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of March 2013, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of filing to counsel of record.

/s/ *Joseph M. Miller*

**JOSEPH M. MILLER**