# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROXANNE MOYER, INDIVIDUALLY | * | CIVIL ACTION NO: 2:11-3185 |
| AND ON BEHALF OF HER DECEDENT | * | |
| HUSBAND, SAMUEL N. MOYER | * | SECTION: E |
| | * | |
| VERSUS | * | MAGISTRATE DIV.: 2 |
| | * | |
| SIEMENS VAI SERVICES, L.L.C, | * | |
| SIGNAL METAL INDUSTRIES, INC., | * | JURY TRIAL REQUESTED |
| ********************************************* | | |

## PRE-TRIAL ORDER

**MAY IT PLEASE THE COURT**:

**1.     DATE OF PRE-TRIAL CONFERENCE**

The Pre-Trial Conference was held on Wednesday, June 12, 2013 at 10:00 a.m.

**2.     APPEARANCE OF COUNSEL**

Counsel for Plaintiff, Roxanne Moyer, *et al*:  Joseph M. Miller (T.A.), Benjamin B. Saunders, Carisa German-Oden, Davis, Saunders & Miller Law Firm, PLC, 400 Mariners Plaza Drive, Suite 401, Mandeville, Louisiana 70448. (T) 985-612-3070, (F) 985-612-3072.

Counsel for Defendant, Siemens Industry Inc.: Nelson W. Wagar, III, Chopin Wagar Richard & Kutcher, LLP, Two Lakeway Center-Suite 900 North Causeway Boulevard Metairie, Louisiana 70002, (T)504-830-3838 (F) 504-836-9540, and Joseph Lipari and Robert J. Kelly, Littleton Joyce Ughetta Park & Kelly LLP, 39 Broadway 34th Floor, New York, New York, 10006. (T) 212-4045773, (F) 212-232-0088.

1

Counsel for Defendant, Signal Metal Industries Inc.:  Kevin R. Derham (T.A.), David J. Bourgeois (T.A.), Andrew D. Weinstock (T.A.) and Erzsebet M. Pifko of Duplass, Zwain, Bourgeois, Pfister and Weinstock, 3838 N.Causeway Blvd., Ste. 2900, Metairie, LA 70002 (T) 504-832-3700, (F) 504-837-3119.

Counsel for Intervenor, ArcelorMittal:  Lawrence B. Frieman (T.A.), Bradley C. Naccari (T.A.), Juge, Napolitano, Guilbeau, Ruli & Frieman, 330 N. New Hampshire St., Covington, LA 70043, (T) 504-831-7270, (F) 504-831-7284.

## 3.    DESCRIPTION OF THE PARTIES

**A.**  Plaintiff, Roxanne Moyer, proceeds on her own behalf and on behalf of her husband, Samuel Moyer, age 32, who died on February 3, 2013 after sustaining fatal injuries in a molten steel explosion in LaPlace, Louisiana. Ms. Moyer is a citizen of the State of Louisiana, and currently resides in St. John Parish.

**B.**  Defendant, Siemens Industry Inc. ("Siemens"): Siemens is the successor in interest to Voest-Alpine Industries, Inc. which designed and constructed the Bayou Steel plant in LaPlace, Louisiana in 1981.  Bayou Steel acquired ownership of the plant via a Stock Acquisition Agreement in June 1986.  Siemens is a direct defendant in these proceedings.

**C.**  Defendant, Signal Metal Industries, Inc. ("Signal Metal") is a Texas corporation with its principal place of business in Irving, Texas. Signal Metal manufactured the ladle that is alleged to have been involved in the subject accident resulting in the death of Samuel Moyer.

2

**D.** Intervenor, Arcelor Mittal is a foreign corporation with its principal place of business in LaPlace, Louisiana. Arcelor Mittal was the employer of Samuel Moyer.

**4.** **JURISDICTION:**

This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties involved. Furthermore, the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

**5.** **PENDING OR CONTEMPLATED MOTIONS:**

**A**. **Plaintiff, Roxanne Moyer:**

1. Plaintiff has filed her first set of Motions *in Limine* in accordance with the Court's Scheduling Order. R. Doc. 151.

**B**. **Defendant, Siemens Industry Inc.:**

1. Siemens filed a Motion for Summary Judgment, a Motion to Exclude Plaintiff's Expert Frank Dietrich, and a Motion to Limit the Testimony of Plaintiff's Treating Physicians. Siemens filed several additional Motions in Limine.

**C**. **Defendant, Signal Metal Industries Inc.:**

Signal Metal has filed the following motions:

1. Motion for Summary Judgment

2. Motion in Limine to Exclude Expert Testimony of Frank Dietrich

3. Motion in Limine to Limit Testimony of Drs. McGee and Littleton

Signal Metal also filed additional evidentiary motions in limine in accordance with the Scheduling Order.

**D**. Intervenor, Arcelor Mittal:

1. None.

**6.** **SUMMARY OF THE MATERIAL FACTS:**

**Plaintiff, Roxanne Moyer:** On February 1, 2011, several tons of melted steel heated to a temperature of approximately 3000°F erupted like a volcano from the top of a steel ladle manufactured by the Defendant, Signal Metal.  During this eruption, the Plaintiff, Samuel N. Moyer, an employee at the Arcelor Mittal LaPlace steel plant, sustained fatal third and fourth degree burn injuries to 100% of his body.  Mr. Moyer, age 32, survived for 30 hours after being burned at work.  He died on February 3, 2011 at the Baton Rouge General Burn Unit.  This case is a wrongful death and survival action brought by Mr. Moyer's surviving spouse, Roxanne Moyer.  They were married for 10 years. They did not have any children.

### A.    Claims versus Signal Metal

Plaintiff's claims against Signal Metal center on its defective design of Ladle No. 4 *and* its failure to provide an adequate warning that the Ladle, designed and manufactured without certain safety features, posed an unnecessary risk to steel workers being injured in a ladle eruption.  Ladle No. 4, the ladle at issue here, is a giant 85-ton cauldron (pot) used to transport melted steel to each phase of the steel manufacturing process.

After molten steel is poured from the furnace into the steel ladle, the molten metal needs to be stirred so that the alloys and chemicals in the steel are properly homogenized.  To achieve this, an inert gas, such as argon, is connected by hose to the bottom of the ladle as it sits on a moveable rail car called a ladle transfer car.  The argon gas is pumped into the ladle during the pouring of steel from the furnace to the ladle.  Once stirring is complete, the argon gas stir hose is disconnected, and the ladle is sent to the next phase of the manufacturing process.  At the time of his injury, Mr. Moyer, the second helper, was tasked with the duty to disconnect the manual stir hose from the bottom of Ladle No. 4.

Ladle No. 4 was designed and manufactured by Signal Metal in 2004-2005 for Bayou Steel (Arcelor Mittal Laplace's predecessor). Signal Metal's Ladle was defective in design for two reasons: First, Signal Metal failed to install an auto coupling device ["AGC"] on the ladle.

AGC is a system by which an inert gas supply is supplied to the ladle automatically without manual connection or disconnection of the stir hose. The coupling is achieved automatically when AGC equipment, installed on both the ladle and ladle car, couple together when the ladle is placed by crane onto the ladle car. This device would have eliminated the need for Mr. Moyer to manually uncouple the stir hose from the bottom of the ladle. Therefore, he would have never been anywhere near the ladle and subject to the risk of being injured in the eruption.

Second, Signal Metal failed to install a ladle lid or cover on the ladle, which would have eliminated or minimized the risk of injury to Mr. Moyer during the ladle eruption. In fact, well before selling this ladle to Bayou Steel, Signal Metal had designed and built ladles with AGC and lids/covers. Finally, it is an undisputed fact in this case that Signal Metal, the industry leader in the design and manufacture of steel ladles, never issued any warning to Bayou Steel that its Ladle, without the AGC safety features or ladle lid, posed an unnecessary risk of harm to steel workers during a ladle eruption.

### B. Claims versus Siemens

Plaintiff's claims against Siemens center on its failure to incorporate AGC technology on its ladle transfer car, upon which the steel ladle rests. Siemens, through its predecessor Voest Alpine, started building steel plants, and ladle transfer cars as part of that endeavor, in the 1950s. Siemens continues to design and manufacture ladle transfer cars today. A ladle eruption is a spillage of liquid steel or slag out of the ladle. Ladle eruptions during the ladle stirring process

are a known risk in the steel manufacturing industry, and can cause injury and death to steel workers.  Therefore, safe design and manufacture of ladle cars requires recognizing that steel workers are exposed on a daily basis to the potential of ladle eruptions.

### 1.  Defective Design Claims- Ladle Transfer Car

According to Siemens, "the principles of AGC technology, the general machinery, and the equipment" had been around for years before 1986, but the AGC system manufactured by Siemens presently [through a sub-supplier TBR Engineering] was not begun until 1991.  The AGC system is "a very good solution" and is "a reasonable step" to eliminating the risk of human exposure while disconnecting a manual stir hose.

The first time that Siemens began designing and manufacturing AGC technology was in 1991.  At that time, Siemens began retrofitting existing ladle cars in its steel plants to include the AGC system.  Before 1986, Siemens could not say if the AGC system could be implemented on ladle cars.  Peter Wimmer, Siemens' Corporate Designee stated: "If it could have been achieved or not I cannot say.  But, at least, in our company, we didn't have any knowledge of a workable automatic coupling system."  Between 1991 and 2004, Siemens completed projects all over the world where it incorporated AGC technology onto its ladles cars as retrofits and as original ladle car design projects. However, it never offered this service to its former plant, Bayou Steel.

At the same time it was incorporating AGC technology all over the world, in 1996, Siemens wrote a letter to Bayou Steel addressing the risk of ladle eruptions in the steel industry. This letter was likely prompted by litigation (evidence of which was provided by Siemens in this case) that Siemens (then Voest Alpine) had been involved in relative to steel workers who had been killed during ladle eruptions. Though the letter talks about ladle eruptions at length, it did

not provide any specific warnings that Siemens' ladle transfer car, without AGC, posed an increased risk of harm to steel workers in the event of a ladle eruption.

While it warns of ladle eruptions, the 1996 letter gives no warnings concerning the design of Siemens' equipment, which it knew was being used in the Bayou Steel plant, especially the ladle cars.  When Siemens sent the ladle eruption warning letter to Bayou Steel in 1996 it knew that ladle eruptions during stirring were a hazard and risk.  Siemens knew the Bayou Steel plant did not have an AGC system.  Siemens also knew firsthand that the AGC system on its ladle car would eliminate the risk of human exposure of disconnecting stir hoses at the bottom of the ladle, and Siemens had the capability of retrofitting the AGC onto the ladles.  Despite all of this knowledge, the 1996 letter perilously omitted the fact the Siemens' ladle cars, without AGC technology, posed an increased risk of harm to steel workers in a ladle eruption, such as Samuel Moyer.

### 2.  Defective Design Claim- Argon Stir Station Platform

Also, Siemens' culpability in this case also arises from its defective design of the argon stir station platform that Mr. Moyer was standing on at the time of the eruption.  This platform lacked guarding/shielding, which would have protected Mr. Moyer from coming into contact with the erupting steel.   The argon stir station has been in place at the LaPlace steel plant since Siemens (then Voest Alpine) built the plant in 1981.  The stir station consists of a steel platform upon which Mr. Moyer was standing when he attempted to disconnect the argon stir hose from the ladle. The platform is arranged to provide access to the ladle and ladle transfer car when moved by rail next to the platform.  At the time of the ladle eruption, the argon stir station platform lacked guarding or shielding.

Shortly after Mr. Moyer's accident, the Plant moved immediately to install ¼ inch steel guarding, and a sliding steel door, at the platform.  Simple shielding was the safer alternative design that Siemens could have easily adopted before 1986.

Siemens has reviewed the engineering drawings of the stir station platform and admits that shielding could have been installed on the platform in 1986.  "Looking at [the] drawings from the technical side, it is possible to install shielding."  Shielding is used in other Siemens steel plants to minimize the risk of steel workers being injured by heat radiation or molten steel burns. From an engineering perspective, Siemens admitted that if guarding can be designed on a piece of equipment to eliminate or minimize human exposure, steps should be taken to do so when feasible.  Based on where Mr. Moyer was standing, shielding on the stir station platform would have minimized the risk of injury to Mr. Moyer.  Finally, with regard to the 1996 ladle eruption warning letter, Siemens did not provide any warning that the argon stir station platform, without shielding, posed an increased risk of harm to steel workers during a ladle eruption.

**Defendant, Siemens Industry Inc.:** Siemens' predecessor built the LaPlace, Louisiana steel mill in 1981.  Siemens owned and operated the mill until 1986.  In 1986, Bayou Steel acquired the mill through a stock acquisition agreement with Siemens. Bayou Steel owned and operated the mill until 2008.  ArcelorMittal purchased the mill in 2008 from Bayou Steel. ArcelorMittal has owned and operated the mill continuously since then, including at the time of the accident.

As built by Siemens in 1981, the mill included an electric arc furnace where scrap steel is melted into molten, liquid form.  That molten steel pours (*i.e. is* "tapped") into an 11-foot tall, 85-ton ladle sitting atop a ladle transfer car.  The ladle transfer car, a 30-ton structure, moves about fifty feet along rails embedded in the concrete steel mill floor.  The ladle transfer car is an

improvement to the immovable Siemens built in 1981 and eventually sold by Bayou Steel to ArcelorMittal in 2008.

To ensure uniform temperature and chemical composition, operators inject argon gas into molten steel in the ladle via a hose manually connected to the bottom of the ladle.  The ladle transfer car then moves the ladle to a multilevel, immovable work platform called the "argon stir station."   This platform is also embedded in concrete, and is also an improvement to the immovable built by Siemens in 1981 and sold to ArcelorMittal in 2008.

On February 1, 2011 operators tapped molten steel out of the electric arc furnace and into the ladle. Operators then manually attached a hose to the bottom of the ladle and pumped argon through the hose into the ladle.  They then used remote controls to move the steel, ladle, and ladle transfer car – more than 125 tons in all – approximately 50 feet by rail to the argon stir station.  The accident occurred as Mr. Moyer stood on the argon stir station to decouple the argon hose from the ladle.  Molten steel within the ladle erupted and knocked Moyer from the argon stir station to the mill floor below, where he sustained fatal burn injuries.  ArcelorMittal conducted its own investigation and determined that a possible cause of the eruption was moist cerwool insulation falling from the roof into the open ladle.  ArcelorMittal had replaced portions of the roof approximately two years before the accident.

Siemens denies that any acts or omissions on its part proximately caused this accident. Siemens denies the existence of any defect or unreasonably dangerous condition or characteristic of the structures it built or fabricated in 1981.  Siemens contends that primary and/or exclusive fault for this accident rests with ArcelorMittal and/or Bayou Steel.

Based on Mr. Moyer's accident, OSHA cited ArcelorMittal for worker safety violations. ArcelorMittal took remedial safety measures, including installation of an "automatic coupling

9

device" for the argon hose.  Although ArcerlorMittal had previously installed the same system at other facilities, it did not deploy the technology at the LaPlace facility prior to Mr. Moyer's accident.

Automatic coupling systems were neither "state of the art" nor commercially viable and available when Bayou Steel acquired the mill in 1986 through the stock acquisition agreement with Siemens.  Although these systems became functional, feasible, and commercially viable in the 1990s when Bayou Steel owned the plant, Bayou Steel did not install the technology.  Had either Bayou Steel or ArcelorMittal installed an automatic coupling system, Samuel Moyer would not have been injured and killed.

On the day of Mr. Moyer's accident, he used a decoupling procedure implemented on November 10, 2007 and revised on March 23, 2009.  Bayou Steel and ArcelorMittal collectively operated the plant for about 25 years, during which time they used bottom stirring and knew that eruptions can occur.  Pursuant to ArcelorMittal's 2008 "Journey to Zero Program;" ArcelorMittal's height hazard standards; and its OHSAS 18001 compliance program, ArcelorMittal conducted hazard identification risk assessments (HIRAs) to determine whether and where guards and rails should be installed throughout their facility.

Furthermore, as Blaine Ockerman testified, ArcelorMittal's Job Safety Analysis ("JSA") documents obligated ArcelorMittal to protect workers from molten steel.  ArcelorMittal also conducted shop floor audits, pursuant to which workers' tasks and procedures were assessed, critiqued, and revised.

In 1996, Siemens sent a letter to Bayou Steel and steel mills around the country.  The letter was not a marketing or sales document intended to promote or sell equipment.  Instead, the

letter warned Bayou Steel and other steelmakers about the importance of implementing procedures to prevent ladle eruptions.

Moreover, representatives from ArcelorMittal LaPlace and ArcelorMittal USA's other subsidiary operating units regularly participated in "best practices" conference calls with ArcelorMittal USA. During these calls, company representatives shared information about worker safety issues and recommended operational techniques and practices. Before Mr. Moyer's accident, ArcelorMittal representatives (including LaPlace process engineer Larry Taylor and LaPlace safety manager Blaine Ockerman) specifically participated in best practices conference calls devoted to ladle eruptions. Ladle eruptions were a well-known industry hazard, and call participants specifically identified automatic gas coupling technology as a company-wide "best practice" _before Mr. Moyer's accident._

Before the accident, ArcelorMittal knew that debris falling into an open ladle could cause an eruption. ArcelorMittal also knew that guards, shields, walls and other barriers were needed wherever workers can come into contact with molten steel or fall from heights. ArcelorMittal admits that the platform where Mr. Moyer was standing was more than 4 feet off the ground and that ArcelorMittal's failure to install guards, shields, or railings at the argon stir station violated its own worker safety standards.

Before the accident, ArcelorMittal USA's Chief Technology Officer Gary Lefko and other ArcelorMittal USA safety engineers regularly accompanied ArcelorMittal LaPlace safety personnel on safety audits and shop floor audits. During these audits, Mr. Lefko dictated that guards, walls, shields and other barriers be installed in locations where operators could be exposed to molten steel. Before the accident, ArcelorMittal knew that (a) eruptions of molten steel from a ladle constitute an industry hazard; (b) operators must be protected from molten

steel and height hazards; (c) manual coupling introduces hazards during coupling and uncoupling; and (d) automatic gas coupling technology existed as a means of preventing operator injury.

**Defendant, Signal Metal Industries Inc.:**   This suit arises out of a steel mill accident resulting in the death of Samuel Moyer, an employee of Arcelor Mittal in LaPlace, Louisiana. The accident happened on February 1, 2011, when Mr. Moyer was struck from above by molten steel that unexpectedly erupted from a ladle above while in the process of manually de-coupling an argon gas pipe from beneath the ladle.  Signal Metal manufactured the subject ladle in 2005. When the accident occurred, Mr. Moyer was performing the tasks assigned by his employer (ArcelorMittal LaPlace), pursuant to his employer's instructions, in a facility owned and operated by his employer.

Plaintiff, barred by worker's compensation immunity from suing her spouse's employer, has therefore formulated various Louisiana Products Liability Act ("LPLA") theories against Signal Metal and a number of other defendants that manufactured various components employed in the ArcelorMittal plant. Signal Metal's role in this entire matter was limited to the manufacture of seven 85-ton replacement refractory-lined steel ladles for ArcelorMittal's predecessor, Bayou Steel, in 2005 according to design specifications provided by Bayou Steel. Signal Metal had no role in the layout of the ArcelorMittal/Bayou Steel plant, the other equipment and configuration of the systems at ArcelorMittal/Bayou Steel, or the production procedures employed by the plant.  Signal Metal is a small company that builds steel ladles (steel shells made for holding molten steel) for use in steel mill applications according to the design specifications of sophisticated steel mill owners.

Although no one has suggested that the ladle in question malfunctioned in some way or failed to comply with the owner's specifications, or for that matter, any governing design standards or guidelines, Plaintiff nevertheless contends that Signal Metal is liable under the LPLA theory of unreasonably dangerous design stated in La. R.S. 9:2800.56 because the ladles were manufactured (again, according to owner specification) without lids and without automatic gas coupling systems ("AGC"), and under a theory of failure to provide adequate warnings pursuant to La. R.S. 9:2800.57 because Signal Metal did not advise Bayou Steel and/or ArcelorMittal of the availability of automatic gas coupling technology, ladle lids and/or the hazards of ladle eruptions (all of which both Bayou Steel and ArcelorMittal were well aware of prior to the manufacture of the subject ladles).

It is undisputed that Signal Metal manufactured the subject ladle pursuant to detailed specifications received from its customer, Bayou Steel, who owned and/or operated the steel mill in 2005.  The ladles were manufactured pursuant to the standards set forth by the Association of Iron and Steel Technology ("AIST") Technical Report Number 9 ("TR-9") (1991 edition).  The TR-9 does not require or mention AGC or ladle lids.  There has been no allegation, evidence or testimony that the ladles manufactured by Signal Metal deviated in any way from the TR-9 standards.  The ladles manufactured by Signal Metal were neither unreasonably dangerous in design nor did Signal Metal have a duty to warn Bayou Steel or ArcelorMittal.

Signal Metal's role was limited to the fabrication of seven replacement ladles and did not involve the implementation of any process modifications at the mill. Bayou Steel was not seeking to retrofit or to alter its steel making process and the building itself, as well as the equipment with which the new ladles had to work, remained unchanged.  As such, Bayou Steel (and later ArcelorMittal) specifically did not request AGC technology with the Signal Metal

ladles, despite having been fully aware of it since at the late 1990s. The facility operated at the time with manual gas coupling technology, which was (and still is) common and standard in the industry.  Bayou Steel had never before used AGC technology on its ladles and did not intend to transition to this type of technology at the time that the ladles were ordered in 2005.  Moreover, it is undisputed that AGC technology was never requested of Signal Metal because Signal Metal does not design or manufacture AGC technology.  Similarly, Bayou Steel witnesses uniformly testified that Bayou Steel specified ladles without lids because the plant configuration and manufacturing process in the area of the accident would not have allowed for the use of lids on the ladles.

**Intervenor, Arcelor Mittal:**  As the employer of Samuel Moyer, Arcelor Mittal has paid workers' compensation benefits to or on behalf of Samuel Moyer pursuant to the Louisiana Workers' Compensation Act.   As such, Arcelor Mittal is entitled to be reimbursed for all workers' compensation benefits paid pursuant to LSA-R.S. 23:1101, et. seq.

**7.     SINGLE LISTING OF ALL UNCONTESTED MATERIAL FACTS:**

**A.**

1.  Samuel N. Moyer was born on August 21, 1978 and died on February 3, 2011.

2.  Samuel N. Moyer and Roxanne N. Guidry were married on December 29, 2001.

3.  The parties stipulate and agree to the authenticity of all listed exhibits, including medical records and photographs.  The parties reserve rights as to admissibility.

4.  Defendant, Signal Metals Industries Inc., manufactured Ladle No. 4, the ladle at issue in this case.

5.  The value of medical expenses incurred in this case as a result of Mr. Moyer's injuries is $46,660.68. The parties dispute liability for payment of these expenses.

6. The LaPlace, Louisiana steel mill, including the argon stir station and ladle transfer car, was built by Siemens's predecessor-in-interest, Voest Alpine ("Siemens") in approximately 1981.

7. Defendant, Siemens Industry Inc., designed and built the platform where Mr. Moyer was working at the time of his injury.

8. At the time Ladle No. 4 was manufactured by Signal Metal, alternative designs for metal ladles existed that included design features that allow for automatic coupling for gas stirring of liquid steel.

9. The ladle transfer car began to operate in the plant in approximately 1981.

10. Siemens owned and operated the steel mill until Bayou Steel acquired the mill through a June 1986 stock acquisition agreement.

11. ArcelorMittal purchased the mill in 2008 and operated it through the date of the accident.

12. At the time of the accident, the ladle transfer car moved the ladle to an argon stir station.

13. The argon stir station is a multilevel, immovable work platform embedded into the mill foundation.

14. The accident occurred as Mr. Moyer was standing with one foot on the argon stir station and one foot on the ladle transfer car and was attempting to manually decouple the argon hose from the ladle.

15. Molten steel within the ladle erupted and knocked him off of the argon stir station to the mill floor below.

16. The details of the decoupling procedure being performed by Mr. Moyer on the day of the accident were developed, drafted and put in place by Bayou Steel on 11/10/07 and then revised by Arcelor Mittal on 3/23/09.

17. This suit arises out of a steel mill accident resulting in the death of Samuel Moyer, an employee of ArcelorMittal in LaPlace, Louisiana.

18. ArcelorMittal purchased the LaPlace mill from Bayou Steel in 2008.

19. The accident happened on February 1, 2011, when Mr. Moyer was struck from above by molten steel that unexpectedly erupted from a ladle above while in the process of manually de-coupling an argon gas pipe from beneath the ladle.

20. When the accident occurred, Mr. Moyer was performing the tasks assigned by his employer, pursuant to his employer's instructions, in a facility owned and operated by his employer, Arcelor Mittal LaPlace.

21. The subject ladle was one of seven new ladles ordered by Bayou Steel to replace the original ladles.

22. The only equipment at issue manufactured by Signal Metal is the ladle itself and Signal Metal had no role in the design or manufacture of any of the other equipment relevant to the subject accident (i.e. electric arc furnace ("EAF"), ladle transfer car, stir station, stir plug, etc…).

23. Manual gas coupling technology was common and standard in the industry in 2005.

24. The Bayou Steel plant in Laplace is a $120 million facility. It began production of steel in July of 1981 under the ownership of Voest Alpine and was later sold to Bayou Steel in 1986.

25. Bayou Steel implemented several equipment upgrades after the purchase of the mill in 1986, including a modification of the electric arc furnace ("EAF") to accommodate the installation of eccentric bottom tapping (EBT), increasing steel productivity, quality, and tapping weight. It then added a secondary ladle metallurgical furnace (LMF) to the liquid steel process equipment. The improvements were completed in 2005 with the addition of seven new ladles that replaced the original ones.

26. ArcelorMittal USA sent Gary Lefko (ArcelorMittal USA's Chief Technology Officer) to perform regular safety audits at ArcelorMittal Laplace after it took over the mill in 2008.

27. After inspecting the melt shop prior to 2011, Mr. Lefko determined where brick walls would need to be installed, where the curbs would need to be installed and where other barriers would need to be installed in order to protect workers against exposure to molten steel.

28. Mr. Lefko has also been responsible for conducting several other hazard assessments for ArcelorMittal to assess the necessity of heat shields and guards to ensure operator safety.

29. Bayou Steel acquired a Ladle Metallurgical Furnace "LMF" in approximately 2000.

30. Siemens began supplying auto coupling technology in 1991.

31. Arcelor Mittal conducted quarterly safety audits within the LaPlace steel mill.

32. Arcelor Mittal conducted quarterly shop floor audits within the LaPlace steel mill.

33. Arcelor Mittal participated in best practices conference calls with operating units throughout the United States.

34. Samuel Moyer was employed by Arcelor Mittal at the time of the accident and death.

35. Bayou Steel Corporation purchased the LaPlace mill from a Siemens entity in 1986.

36. Samuel Moyer's accident and death occurred while in the course and scope of his employment with Arcelor Mittal.

37. Arcelor Mittal has paid and continues to pay workers' compensation benefits to and on behalf of Samuel Moyer pursuant to the Louisiana Workers' Compensation Act.

**8.    SINGLE LISTING OF ALL CONTESTED ISSUES OF FACT:**

**A.**

1. Whether the ladle transfer car was unreasonably dangerous or "defective" when constructed in 1981;

2. Whether the argon stir station was unreasonably dangerous or "defective" when constructed in 1981;

3. Whether alternative technology existed and was capable of preventing the plaintiff's accident existed before June 1986;

4. Whether Siemens had a duty to plaintiff.

5. Whether ArcelorMittal knew about ladle eruptions and automatic coupling technology before the accident.

6. The cause of the eruption in the ladle that injured the decedent at the time of the accident in this case;

7. The proximate cause of the injuries and death;

8. The amount of special and/or general damages, if any, to which the plaintiff is entitled;

9.  The fault of Arcelor Mittal Laplace, Arcelor Mittal USA, RSR Bayou Steel or other third parties in causing the accident, injury to and death of Samuel Moyer;

10. Whether the argon stir station platform and ladle transfer car were within Siemens' control in 1995 during the Electric Arc Furnace Rebuild;

11. Whether at all relevant times, the ladle, ladle transfer car, and platform at issue in the case were all operated and handled by the steel plant within each product's "reasonably anticipated use."

12. Whether auto gas coupling technology adversely affects the utility of the ladle, the ladle transfer car, or the stir station platform.

13. Whether shielding placed at the stir station platform adversely affects the utility of the ladle, the ladle transfer car, or the stir station platform.

14. Whether at the time the stir station platform was manufactured by Siemens Industry Inc., alternative designs for platforms existed that included design features that allow for shielding.

15. Whether the argon stir station and ladle transfer car were custom designed by Siemens for use by Siemens in Siemens' own steel mill.

16. Whether the ladle transfer car is a structure that moves along rails embedded within concrete in the steel mill floor.

17. Whether Signal Metal built the 85-ton steel ladle (a large steel shell/bucket made for holding molten steel) for Bayou Steel in 2005 according to the design specifications provided by Bayou Steel through its melt shop engineer/superintendent Larry Taylor.

18. Whether Bayou Steel specifically requested and specified that the ladles be manufactured to work with the existing systems in place at the mill in 2005 which system utilized manual coupling of the argon stir hose.

19. Whether Bayou Steel did not specify automatic gas coupling ("AGC") technology or a ladle lid in the specifications it provided to Signal Metal for the new ladles in 2005.

20. Whether Bayou Steel had never before used AGC technology on its ladles and did not intend to transition to this type of technology at the time that the ladles were ordered in 2005.

21. Whether Larry Taylor, the engineer/melt shop superintendent for the Bayou Steel who worked with Signal Metal in providing the specifications for the new ladles had been aware of AGC since the late 1990s.

22. Whether Larry Taylor had been aware of ladle eruptions since the 1980s.

23. Whether Mr. Taylor specifically did not want AGC with the new Signal Metal ladles because it was very difficult to implement and maintain and, according to him, he was "scared of it."

24. Whether AGC was never talked about in the process of specifying the ladles.

25. Whether Mr. Taylor would not have gone to Signal Metal with any inquiries regarding AGC technology.

26. Whether the Request for Quotation set forth the current problems with the existing original ladles and the features that Bayou Steel wanted in the new ladles – neither AGC technology nor ladle lids are mentioned anywhere.

27. Whether Mr. Taylor, in working collaboratively with Signal Metal during the design and fabrication phases for the new ladles, reviewed and approved of all drawings for the ladles – which did not incorporate AGC technology or lids.

28. Whether neither Bayou Steel nor ArcelorMittal wanted a ladle lid for use in the area where the accident occurred, specifically at the stir station immediately after tapping the EAF.

29. Whether ArcelorMittal employees (and former Bayou Steel employees) Larry Taylor, Greg Irby and Blaine Ockerman testified that a ladle lid could not have been used in the area where the accident occurred.

30. Whether a ladle lid is still not used in the area where the subject accident occurred.

31. Whether Bayou Steel had manufactured hundreds of thousands of tons of steel since the 1980s, and was aware of the characteristics of the equipment it designed and ordered, including ladle eruption hazards and the various methods by which such hazards can be mitigated.

32. Whether Bayou Steel's successor, ArcelorMittal, which acquired the mill in 2008 and operated the facility at the time of Mr. Moyer's accident, is a corporation headquartered in Luxembourg, and is "the largest steel producing company in the world," with plant locations on four continents in over twenty countries.

33. Whether ArcelorMittal, as the world's leading steel and mining company, is "in the forefront of the steel industry," and is committed to setting globally recognized fatality prevention standards.

34. Whether the process controls, methodology and equipment used by a mill in the stirring process is entirely the decision of the company making the steel.

35. Whether Bayou Steel had the final word on the design of their product and could require a manufacturer to modify any product which was not fabricated to work for the purpose it was intended for.

36. Whether Signal Metal does not design or fabricate AGC systems so any AGC system a customer would want on a ladle would have to come from a third party source and be specified by the customer.

37. Whether at the time of plaintiff's accident, ArcelorMittal, along with the entire steel making industry, was well aware of the hazard created by explosions or eruptions of steel and the existence of AGC technology.

38. Whether employing automatic coupling is not the exclusive and not even the uniformly preferred method of protecting a steel worker from harm as a result of molten steel.

39. Whether Frank Dietrich opined that it is possible to design a ladle with manual gas coupling in a manner that is not defective.

40. Whether Mr. Dietrich admitted to personally having the occasion to observe a safe manual connection, such as one operated by an extended hook or arm.

41. Whether AGC systems were state of the art technology in the steel making business, particularly in the melt shop area where Bayou Steel was performing its stirring operations, at the time when Signal Metal manufactured the ladles in 2005.

42. Whether as with AGC, Bayou Steel (and subsequently ArcelorMittal) was fully aware of the use of ladle lids but specifically did not request or desire ladle lids from Signal Metal when the ladles were specified by Bayou Steel or even subsequent to ArcelorMittal's purchase of the mill in 2008.

43. Whether Bayou Steel also specified lidless ladles because the plant configuration and manufacturing process would not have allowed the use of lids on the ladles.

44. Whether Frank Dietrich, has done any tests, any modeling, or any calculations to determine whether any or all of the steel would have remained in the ladle had a lid been in place.

45. Whether Mr. Dietrich, has done any kind of design, measurement or calculation to determine what would have had to be done to accommodate a process to place lids on ladles at the Bayou Steel facility.

46. Whether a ladle eruption may have sufficient force to move a lid.

47. Whether there is no evidence or testimony by any witness, fact or expert, that the ladle manufactured by Signal Metal did not comply with the Association for Iron and Steel Technology's Technical Report Number 9 ("TR-9"), 1991 edition (which sets forth the design standards applicable to the design and manufacture of ladles in the United States steel industry).

48. Whether automatic coupling technology capable of preventing the decedent's accident did or did not exist prior to 1991?

49. Whether before the 2011 accident, Arcelor Mittal LaPlace and Arcelor Mittal USA identified automatic gas coupling technology as a companywide best-practice.

50. Whether, in 2005 when the ladle left Signal Metal's control, it was feasible to use a ladle lid in the area where the accident occurred?

**9.     SINGLE LISTING OF ALL CONTESTED ISSUES OF LAW:**

**A.**

1. Whether the ladle manufactured by Signal Metal was unreasonably dangerous in design pursuant to La.R.S. 9:2800.56?

2. Whether Signal Metal had a duty to warn Samuel Moyer, Bayou Steel and/or ArcelorMittal of the hazards of ladle eruptions, AGC and/or ladle lids?

3. The applicability of La. R.S. 9:2772 ("statute of repose") to the facts of this accident as a complete bar to recovery of damages by plaintiff against Siemens.

4. The applicability of La. R.S. 9:2800 et seq (LPLA) to the facts of this case as to Siemens, including but not limited to:

   a. Whether Siemens is a "manufacturer" of a "product?"

   b. Whether Siemens had a duty to warn?

   c. Whether Siemens breached a duty to warn?

21

d.  Whether Siemens' warnings were adequate?

e.  Whether Siemens owed a duty to plaintiff?

f.  Whether Siemens breached a duty to plaintiff?

g.  Whether alternative warnings must be proffered in support of a failure to warn claim?

h.  Whether alternative design capable of preventing the accident existed prior to Siemens' 1986 stock transfer.?

i.  Whether the alternative designs proffered by plaintiff were feasible?

j.  Whether there was a likelihood that the design of the argon stir station and ladle transfer car would cause plaintiff's damages and whether the gravity of that damage outweighed the burden of adopting such alternative designs and the adverse effect, if any, of such alternative designs on the utility of the products?

k.  Whether the argon stir station was unreasonably dangerous in design?

l.  Whether the ladle transfer car was unreasonably dangerous in design?

m.  Whether the ladle transfer car and argon stir station were unreasonably dangerous at the time they left Siemens' control?

n.  Whether Mr. Moyer's injuries were proximately caused by characteristics of the products that rendered the products unreasonably dangerous?

o.  Whether Siemens knew and, in light of then-existing reasonably available scientific and technological knowledge, could have known of the design characteristics that caused the damage or the danger of such characteristic?

p.  Whether Siemens knew and, in light of then-existing reasonably available scientific and technological knowledge, could have known of the alternative designs identified by the plaintiff?

q.  Whether subsequent remedial measures are admissible?

5.  To the extent Plaintiff has suffered any damages, the damages were caused by the fault of third parties, including Samuel Moyer's employer, ArcelorMittal, for whom Siemens has no responsibility. Inasmuch as the liability of Siemens and the right, if any, of plaintiff to recover in this litigation can only be

determined after the percentages of fault of all parties to the incident are determined, whether or not they are parties to this litigation, Siemens seeks an adjudication of the percentage of fault of each and every person or entity whose fault contributed to this incident.

6.  Whether ArcelorMittal is a sophisticated user?

7.  Whether Bayou Steel was a sophisticated user?

8.  A contested issue of law exists concerning the inclusion of Arcelor Mittal, LCNA, and Arcelor Mittal-Luxembourg on the verdict form, which are the parent companies of Arcelor Mittal, LaPlace L.L.C.

9.  Apportionment of fault of non-party entities on the verdict form.

**10.   EXHIBIT LISTS:**

**A.      Joint Exhibits Without Objection:**

1.  Certificate of Live Birth [Moyer 1];

2.  Certificate of Marriage [Moyer 2];

3.  Death Certificate [Moyer 3];

4.  Acadian Ambulance Records [Moyer 4-22];

5.  Baton Rouge General Burn Unit Records [Moyer 23-238];

6.  River Parishes Hospital Medical Records [Moyer 239-261];

7.  St. John Coroner's Report [Moyer 262-274];

8.  Medical Response Report Rebecca Saussaye [Moyer 275];

9.  OSHA Citation and Notification of Penalty [Moyer 276-280];

10. Arcelor Mittal Health & Safety Alert [Moyer 516-519];

11. Arcelor Mittal Special Incident Report-Saussaye [Moyer 520-521];

12. Arcelor Mittal Special Incident Report-Stewart [Moyer 522];

13. Arcelor Mittal LaPlace Daily Furnace Production Log February 1, 2011;

14. Ladle No. 4 Service Log [Moyer 523-525];

15. Heat Sheet Log Heat# 78950 [Moyer 526-527];

16. Moyer Personnel File [Moyer 1202-1292]

17. Internal Revenue Service, Tax Returns 2006 to 2008 [Moyer 1053-1100];

18. Automatic Gas Coupling System 3-5-1985 [Moyer 1305-1312];  Attachment 8 to Frank Dietrich's Report- Gas Hook-UP to a Ladle, U.S. Patent No, 4,502,670 (Issued Mar. 5, 1985);

19. Attachment 10 to Frank Dietrich's Report- Apparatus for Coupling a Metallurgical Gas Supply to a Ladle, U.S. Patent No. 4,883,259 (Issued Nov. 28, 1989).

20. Attachment 20 to Frank Dietrich's Report- Ladle Lid Arrangement, U.S. Patent No. 4,833,346 (Issued May 30. 1989).

21. E-mail Larry Taylor to Ed Dee March 22, 2005 [Signal Metal 349];

22. E-mail Larry Taylor to Ed Dee March 24, 2005 [Signal Metal 359-360];

23. Letter Shelly Rome to Ed Dee February 9, 2005 [Signal Metal 363];

24. E-Mail: Ed Dee to Larry Taylor March 15, 2005 [Signal Metal 386];

25. E-mail:  Ed Dee to William Mann April 15, 2005 [Signal Metal 395];

26. Signal Metal Quote for Bayou Steel Ladle Project [Signal Metal 468-479];

27. Bayou Steel Request for Quote to Signal Metals October 21, 2004 [Signal Metal 480-481];

28. E-mail:  Larry Taylor to Ed Dee January 21, 2005 [Signal Metal 503];

29. Sales Order March 23, 2005 to Interstop Corporation [Signal Metal 618];

30. Signal Metal Invoice to Bayou Steel for Ladle Project September 30, 2005 [Signal Metal 637-638];

31. E-mail:  Larry Taylor to Ed Dee March 16, 2005 [Signal Metal 743];

32. Brochure [Signal Metal 1264-1265];

33. Acquisition Agreement June 16, 1996 [SII469-539];

34. Meeting Report, Melt Shop Production Study June 1, 2000 [SII 540-542];

24

35. Voest Alpine Ladle Transfer Car Drawings [SII 543, 562-563]

36. Siemens VAI Reference List Ladle Furnaces with Auto Coupling [SII 733-742];

37. Siemens VAI Product Reference List [SII 743-745];

38. Siemens Sub-Supplier TBR Engineering Auto Coupling Information Sheet [SII 746-756];

39. Siemens Sub-Supplier TBR Engineering Auto Coupling Reference Sheet [SII 757-758];

40. OSHA File (SII 1-235) [Moyer 281-515]

41. Voest Engineering Drawings (including SII 543-732); Engineering Drawings annexed as Exhibit A to Peter Wimmer's Affidavit;

42. Gary Lefko Deposition Exhibits 2 and 3 – all safety audits and materials.

43. US Patent 5,823,221 – [Moyer 629-644]

44. Specifications for Design and Use of Ladles (AISE Technical Report No. 9 - 1991)[Signal Metal 1-235].

45. (7) 85 Ton Hot Metal Ladles – Bayou Steel P.O. No. 2048223 – Signal Metal Order No. 11975 [Signal Metal 236-344].

46. General correspondence [Signal Metal 345-466].

47. Quotations and Bayou Steel RFQs [Signal Metal 467-505]

48. Purchase Orders [Signal Metal 506-588].

49. Sales Orders [Signal Metal 589-746].

50. Bayou Steel Ladle Drawings [Signal Metal 1012-1053].

51. Arcelor Mittal Stir Plug Purchase Order [Moyer 548-553].

52. Drawing Reflecting Argon Stir Station [Moyer 1353-1358].

53. Engineering Records and Drawings [Signal Metal 873-917]

54. Ladle No. 4 (New) Shipping Photos [Signal Metal 1054-1055].

25

55. Siemens VAI Ladle Transfer Car and Automatic Gas Coupling Engineering Drawings [SII0543-0732].

56. Arcelor Mittal audit, site visits and inspection reports (produced by Gary Lefko).

57. River Parish Contractors responses to Siemens subpoena relative to roof repair

58. A computer printout showing all workers' compensation benefits paid to date to and on behalf of Samuel Moyer. (*The parties agree that this evidence is admissible for the limited purpose of establishing the lien due as a result of worker's compensation payments made by Arcelor Mittal, which is a claim that will be tried outside the presence of the jury. The parties further agree that this evidence will not be published to the jury.*)

## B.  Joint Exhibits With Objection:

59. Arcelor Mittal Explosion Video;

60. ArcelorMittal LaPlace Layout – Moyer 538-547

61. Siemens VAl Automatic Gas Coupling System [Moyer 647-658].

62. Signal Metal Quotation April 22, 1996 to Voest Alpine [Signal Metal Confidential 1301-1306];

63. Voest Alpine Ladle Specifications [Signal Metal Confidential 1315-1316];

64. Signal Metal Sales Order Argon System Add-on [Signal Metal Confidential 1340];

65. Letter to Voest Alpine October 16, 1996 Re: Argon System [Signal Metal Confidential 1343];

66. Signal Metal Invoice to Voest Alpine October 30, 1996 [Signal Metal Confidential 1390];

67. Fax Message: Ryan Robinson to Matt Vizzini January 17, 1997 [Signal Metal Confidential 1450];

68. Fax Transmission: Matt Vizzini to Ryan Robinson September 9, 1996 [Signal Metal Confidential 1457-1458];

69. Letter with Attachments Ryan Robinson to Matt Vizzini re: Argon System January 13, 1997 [Signal Metal Confidential 1460-1467];

70. Voest Alpine Purchasing Specification [Signal Metal 1489- 1493];

71. Handwritten Notes December 16, 1997 Site visit to Voest Alpine-Birmingham Steel [Signal Metal Confidential 1568-1571];

72. Voest Alpine Notes For Argon Piping on Ladle, 1996 Project [Signal Metal Confidential 2040];

73. Notes: Signal Metal Voest Alpine Ladle Project September 24, 1996 [Signal Metal Confidential 2104-2105];

74. Request for Quotation 150 ton Teeming Ladle Voest Alpine February 22, 1996 [Signal Metal Confidential 2162-2166];

75. Request for Quotation Ladle Cover Voest Alpine February 22, 1996 [Signal Metal Confidential 2207-2212];

76. Handwritten Statements of Arcelor Mittal Employees [Moyer 1370-1386].

77. SES Engineering Drawings for Auto Coupling [Moyer 1348-1352];

78. SES Engineering Auto Coupling Inventor Pictures [1-19];[1]

79. SES Auto Coupling Quotation for Ladles and Ladle Transfer Cars [1-29];

80. SES Auto Argon Seal Block Assembly (19339A-1002);

81. SES Auto Argon Seal Block Plunger (19339A-4000);

82. SES Auto Argon Modification Ladle Car (19339A-1001_Sheet 1);

83. SES Engineering Drawings for Auto Coupling [Moyer 1348-1352];

84. Engineering Drawings Reflecting Post-Accident Modifications to Ladle No. 4 and Ladle Transfer Car [Moyer 1348-1352].

85. Letter: Siemens to Bayou Steel Re: Safety Hazard Warning May 21, 1996 [SII 804-806];

86. Siemens VAI SIMETAL Car with AGC Brochure and References [SII0759-0803].

87. Attachment 14 to Frank Dietrich's Report- SMS AGC Reference List;

88. Siemens VAI Inert Gas Coupling System [Moyer 647-658];

89. Baton Rouge General Burn Unit Photographs [Moyer 1187-1194];

---

[1] All SES documents will be redacted to remove date references and references to Arcelor Mittal.

90.  Updated Arcelor Mittal Investigation Report [Moyer 1387-1454];

91.  Text Messages June 2010-February 2011 [Moyer 1455-1523]

92.  Inspection Photos 6-4-12 [Moyer 1103-1120, 1127-1164, 1166-1185]

93.  Inspection Photos 12-27-12 [Moyer 1536-1585]

94.  Siemens Ladle Transfer Car and Auto Coupling Brochure [SII 759-803];

95.  Prior Lawsuits Versus Siemens [SII 813-818];

96.  VAI Ladle Transfer Car Risk Assessment June 2003 [SII 847-857];

97.  VAI Ladle Transfer Car Risk Assessment February 2008 [SII 858-868];

98.  DIN EN Standards for Safety of Machinery, General Principles [SII 869-957];

99.  DIN EN Standards for Safety of Machinery, Steel Equipment [SII 958-1011];

100.  October 31, 1994 Bid Form for Bayou Steel Corporation and related project documents [SII0236-SII0243];

101.  Voest Alpine Bayou Steel Scheduling Chart for Furnace Conversion [SII 297];

102.  Letter: Voest Alpine to Bayou Steel March 7, 2005- Budget Estimate EAF Revamp [SII383-387];

103.  VAI-IIC-BSC Preconstruction Meeting Memo[SII0259-SII0260];

104.  Bayou Steel fax from Taylor 4-12-95 [SII0301-305];

105.  VAII Sketch Note from Cesaretti to Taylor 4-25-95 [SII0312];

106.  Bayou Steel fax from Taylor 4-20-95 [SII0321-351];

107.  May 8, 1995 EAF Conversion Chart [SII0252];

108.  Ladle No. 4 Repair May 25, 2010 [Signal Metal 918-953];

109. All Discovery Responses by Defendant Signal Metal Industries, Inc., including Answers to Interrogatories, Responses to Requests for Production and Responses to Requests for Admission;

110. All Discovery Responses by Defendant Siemens Industry Inc., including Answers to Interrogatories, Responses to Requests for Production and Responses to Requests for Admission;

111. All Discovery Responses by Plaintiff including Answers to Interrogatories, Responses to Requests for Production

112. Internet article and comment by Frank Dietrich – "Big Company, Small OSHA Penalties."

## 11.   DEPOSITIONS LISTS:

### A.   Plaintiff, Roxanne Moyer

1. Plaintiff reasonably anticipates that she will introduce the video deposition testimony of Johannes Rosner, who was designated as a Corporate Witness for the Defendant, Siemens Industry Inc. Our statement herein is based on our belief that Mr. Rosner will not be made available for trial by the defense as he resides outside the Court's subpoena power. Also, Plaintiff will play the video deposition of Registered Nurse Ana Dupuy.

2. Based on discussions with the Defendants, Plaintiff believes that the following witnesses listed in this Item will be available for trial.  However, Plaintiff would like to reserve the right to introduce their deposition testimony in the event that they do not voluntarily submit to testify live: William Mann, Ed Dee, Peter Wimmer, Frank Wisniewski, Matt Nousak, Richard Fruehan, Ph.D., Stuart Brown, Ph.D., John Henshaw, Gary Lefko, and Greg Irby.

### B.   Defendant, Siemens Industry Inc.:

1. Siemens anticipates that it will introduce the deposition testimony of Gary Lefko, who was designated as a Corporate Witness by non-party ArcelorMittal USA. Siemens understands that Mr. Lefko will not be made available for trial as he resides outside the Court's subpoena power. Siemens also anticipates offering the testimony of Greg Irby (NARCO) and Johannes Rosner (Siemens VAI).

2. Defendants Siemens Industry Inc., reserves the right to introduce the deposition testimony of  Bill King, Larry Taylor, Mike Blessing, Bryan Richoux, James Davis, Johannes Rosner, Peter Wimmer, Ed Dee, William Mann, Gregory Irby, Jesse Cheramie, Blaine Ockerman, Wendy Stehling,

Frank Dietrich, Roxanne Moyer; Frank Wisniewski, Matt Nousak, Richard Fruehan, Ph.D., Stuart Brown, Ph.D., John Henshaw, Hewitt Wayne Simmons

**C. Defendant, Signal Metal Industries Inc.**

Signal Metal Industries, Inc. reserves the right to present the testimony of the following witnesses by deposition designation as they reside outside of the Court's subpoena power:

1. Johannes Rosner (mechanical engineer, Siemens VAI)

2. Peter Wimmer (mechanical engineer, Siemens VAI)

3. Gary Lefko (Chief Technology Officer, ArcelorMittal USA)

4. Greg Irby (North American Refractories Company, Inc.)

Signal Metal Industries, Inc. believes the remainder of witnesses listed by it will be available for trial; however, it reserves the right to introduce their testimony by way of deposition in the event they become unavailable for trial.

**D. Intervenor, Arcelor Mittal**

1. None

**12. CHARTS AND DEMONSTRATIVE AIDS:**

**A. Plaintiff, Roxanne Moyer:**

1. Plaintiff will likely use the Elmo projector to "blow-up" trial exhibits including, inspection photographs, economic evaluation calculations, timelines (chronicling ownership of the LaPlace steel facility and Plaintiff's medical treatment during his 30 hours of survival).

**B. Defendant, Siemens Industry Inc.:**

1. Defendant, Siemens Industry Inc., will likely use the Elmo projector to present enlargements or reproductions of trial exhibits including photographs and specification diagrams and may use poster board demonstrative exhibits of any admissible exhibits listed herein (to, among other thing, chronicle relevant timelines). Siemens will also likely project exhibits and videotaped depositions using a computer and screen.

**C. Defendant, Signal Metal Industries Inc.:**

Signal Metal Industries, Inc. anticipates the use of the Elmo projector and monitors in the courtroom to present enlargements or reproductions of video and/or photographic and/or other evidence or demonstratives.  Signal Metal Industries, Inc. has not yet determined what demonstrative aids it may use but anticipates at least the following:

1. Excerpts of the OSHA investigations, citations and/or reports
2. Excerpts of the ArcelorMittal investigations and/or root cause analyses
3. Photographs and videos of inspections of the ArcelorMittal facility
4. Timelines of facility ownership
5. Timelines of technological developments
6. Request for Quotations from Bayou Steel to Signal Metal Industries, Inc.
7. Purchase Orders/Sales Orders
8. Engineering and Facility Drawings
9. AISE Technical Report No. 9 (1991)
10. Excerpt(s) of reports of Frank Dietrich
11. EAF tapping into ladle
12. Ladle photographs

Signal Metal Industries, Inc. reserves the right to amend this list.

**D.**      **Intervenor, Arcelor Mittal:**

1. None.

**13.**    **WITNESS LIST**

**A.**      **Plaintiff, Roxanne Moyer, certifies that this Witness List was filed in accordance with previous court orders.[2]**

**Will Call:**

1. Roxanne Moyer; Address: 253 North Millet Avenue, Gramercy, Louisiana 70052

2. Dorothy Guidry;

   a. Ms. Guidry is Roxanne Moyer's mother and may testify regarding her daughter's claims of grief, loss of love, society, and affection. Address: 253 North Millet Avenue, Gramercy, Louisiana 70052

3. Jeffrey C. Littleton, M.D.

---

[2] Plaintiff herein makes a good faith representation of the subject matter of each witness's testimony without intending limit the testimony solely to those areas.  Therefore, Mrs. Moyer would like to reserve the right to question each witness as to all matters relevant in the case within the witness's personal knowledge, and/or as otherwise allowed by the Federal Rules of Evidence.

a. Dr. Littleton rendered treatment to Mr. Moyer at the Baton Rouge General Burn Unit and may testify regarding his treatment to Mr. Moyer and his conscious pain and suffering during Mr. Moyer's survival. Address: 7855 Howell Blvd., Suite 300, Baton Rouge, Louisiana 70807.

4. Jodi McGee, M.D.

a. Dr. McGee rendered treatment to Mr. Moyer at River Parishes Hospital on the evening of February 1, 2011. Dr. McGee may testify regarding his treatment to Mr. Moyer and his conscious pain and suffering during Mr. Moyer's survival. Address: 500 Rue de Sante, LaPlace, La 70068.

5. Ana Dupuy, R.N.

a. Ms. Dupuy rendered nursing care to Mr. Moyer at the Baton Rouge General Burn Unit. She may testify regarding her treatment to Mr. Moyer and his conscious pain and suffering during Mr. Moyer's survival. Address: 3600 Florida Blvd. Baton Rouge, Louisiana

6. Peter Wimmer, Mechanical Engineer, individually and on behalf of, Siemens VAI;

a. Mr. Wimmer is a designated corporate representative of the Defendant Siemens Industry Inc. The witness may testify regarding all matters covered in the Rule 30(b)(6) deposition taken in December of 2012. These areas include, but are not limited to, the design and manufacture of ladle transfer cars and automatic gas coupling technology.

7. Johannes Rosner, Mechanical Engineer, individually and on behalf of, Siemens VAI;

a. Mr. Rosner is a designated corporate representative of the Defendant Siemens Industry Inc. The witness may testify regarding all matters covered in the Rule 30(b)(6) deposition taken in December of 2012. These areas include, but are not limited to, design and manufacture of the stir station platform at issue in this case.

8. William Mann, Design Engineer, Signal Metal Industries;

a. Mr. Mann may testify regarding the design and manufacture of the Ladles at issue in this case, including design and safety principles used during the ladle project in this case. Mr. Mann's testimony may also

extend to the issue of ladle covers. Address: 850 East Pioneer, Irving, TX  75061

9. Ed Dee, Sales Manager, Signal Metal Industries;

   a. Mr. Dee may testify regarding his involvement in the 2005 Ladle project for Bayou Steel and the 1996 Ladle project for Siemens' predecessor, Voest Alpine. Address: 850 East Pioneer, Irving, TX 75061

10. Ryan Robinson, Owner, Signal Metal Industries;

   a. Mr. Robinson may testify regarding his involvement in the 2005 Ladle project for Bayou Steel and the 1996 Ladle project for Siemens' predecessor, Voest Alpine. He may also testify regarding the design and manufacture of the Ladles at issue in this case, including design and safety principles used during the ladle project in this case.  Mr. Robinson's testimony may also extend to the issue of ladle covers. Address: 850 East Pioneer, Irving, TX  75061

11. Bryan Richoux, Arcelor Mittal Melt Shop Shift Foreman, Furnace Supervisor;

   a. Mr. Richoux was present at the time of the ladle eruption and was working as the furnace melter.  He may testify regarding his operation of the furnace, the steel production process in general during his employment history, the damages sustained by Mr. Moyer, and all other relevant matters within his personal knowledge. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address: 14765 Kraft Lane, Ponchatoula, Louisiana, 70454

12. Blaine Ockermann, Arcelor Mittal Health and Safety Supervisor;

   a. Mr. Ockermann may testify regarding all issues regarding the Plant's safety and health programs during his employment as well as the post-accident investigation conducted by the Plant. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address: 123 Lynn Drive, Paradis, Louisiana 70080

13. Hewlett Wayne Simmons, Arcelor Mittal Steel Worker;

a. Mr. Simmons may testify regarding the steel production process at the LaPlace Steel Plant during his period of employment. Address: ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

14. Bill King, Arcelor Mittal Management;

a. Mr. King may testify regarding the JSAs for "tapping a heat," Sam Moyer's job duties and training as a second helper, as well as his personal knowledge concerning the steel production process during his employment, and the post-accident investigation. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:  50606 Creekside Drive, Loranger, Louisiana, 70446

15. J. Cheramie, Arcelor Mittal Maintenance Mechanic;

a. Mr. Cheramie may testify concerning his observations on the night of the accident, including Mr. Moyer's injuries.  Mr. Cheramie may also testify about the feasibility of placing shielding at the argon stir station and his observations of Ladle No. 4 after the accident. Address: 308 Davis Drive, Luling, LA  70070

16. Mike Blessing, Arcelor Mittal Management;

a. Mr. Blessing may testify regarding the steel production process, the plant's safety and health programs, the post-accident investigation, as well as his observations of Mr. and Mrs. Moyer at River Parishes Hospital and the Baton Rouge General Burn Unit. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address: 19421 Camille Lane, Hammond, Louisiana, 70401

17. Larry Taylor, Arcelor Mittal (Laplace);

a. Mr. Taylor may testify regarding the 2005 ladle purchase from Signal Metal, his engineering background and job duties, and all other equipment and process changes to the plant that he has overseen during his tenure at the plant.  Mr. Taylor may also testify about his knowledge and use of auto coupling technology. He may also testify regarding feasibility of post-accident modifications and equipment

changes, including potential adverse effects of modifications on utility of equipment. Address: 14170 Hickory Drive, Ponchatoula, Louisiana, 70454

18. W.P. Culbertson, Ph.D.

   a. Dr. Culbertson will provide opinions regarding his calculation of the economic loss in this case, including Plaintiff's claims for loss of services and loss of support. Address: 17527 West Lakeway Drive, Baton Rouge, Louisiana 70810.

19. Frank E. Dietrich, DH Consulting Inc.

   a. Mr. Dietrich will be offered opinion testimony regarding the steel production process, the industry use of auto coupling technology, shielding, and ladle lids, and the feasibility of enacting those measures set forth in the law applicable to this case.  Mr. Dietrich may also render opinions on those matters discussed in his narrative report and his deposition testimony. Address: 7641 Coriander Way, Harrisburg, Pa 17112.

**May Call:**

20. Ray Grubbs;

   a. Mr. Grubbs was a close friend of Mr. and Mrs. Moyer and can discuss issues that may be relevant to Plaintiff's claims of Loss of Love, Society, and Affection.

21. Delaine Guidry;

   a. Ms. Guidry may testify regarding Mrs. Moyer's claims of Grief, Loss of Love and Affection.

22. Frank Newfield;

   a. Mr. Newfield may testify regarding Plaintiff's claims of Grief.

23. Dominic Arcuri, III, M.D., Assistant Coroner, St. John Parish, Louisiana;

   a. Dr. Arcuri may testify regarding the Coroner's Report, Mr. Moyer's injuries and his cause of death.

24. Christy A Montegut, M.D., Coroner St. John Parish, Louisiana;

a. Dr. Montegut may testify regarding the Coroner's Report, Mr. Moyer's injuries and his cause of death.

25. Michael McCoy, Acadian Ambulance-EMT;

a. May testify regarding medical treatment to Plaintiff.

26. Clinton Blades, Acadian Ambulance-EMT;

a. May testify regarding medical treatment to Plaintiff.

27. Stacey Bye, Acadian Ambulance-EMT;

a. May testify regarding medical treatment to Plaintiff.

28. Reza Sheybani, M.D., Baton Rouge General Hospital;

a. May testify regarding medical treatment to Plaintiff.

29. Heather Gambell, RN, River Parish Hospital;

a. May testify regarding medical treatment to Plaintiff.

30. Amanda Aiello, RN, Baton Rouge General Burn Unit;

a. May testify regarding medical treatment to Plaintiff.

31. Rebecca Saussaye, Arcelor Mittal EMT;

a. May testify regarding medical treatment to Plaintiff.

32. Dorinda Folse, OSHA Area Director;

a. Ms. Folse may testify regarding the OSHA investigation conducted at the Plaint after the accident.

33. Bruce Genter, Siemens VAI;

a. May testify regarding the Melt Shop Production Study and resulting Memorandum authored in 2000.

34. Larry Montani, Siemens VAI;

a. May testify regarding the Melt Shop Production Study and resulting Memorandum authored in 2000.

36

35. Tom Ignatz, Siemens VAI;

    a. May testify regarding the Melt Shop Production Study and resulting Memorandum authored in 2000.

36. Wiley Thibodeaux, Arcelor Mittal LaPlace;

    a. May testify regarding the Melt Shop Production Study and resulting Memorandum authored in 2000. Address:   ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

37. Paul Fredo, Vice President Administration, Siemens VAI;

    a. May testify regarding VAII Safety Warning letter authored May 21, 1996.

38. Robert Robinson, Owner, Signal Metal Industries;

    a. Mr. Robinson may testify regarding his involvement in the 2005 Ladle project for Bayou Steel and the 1996 Ladle project for Siemens' predecessor, Voest Alpine. He may also testify regarding the design and manufacture of the Ladles at issue in this case, including design and safety principles used during the ladle project in this case.  Mr. Robinson's testimony may also extend to the issue of ladle covers. Address: 850 East Pioneer, Irving, TX  75061

39. Dee Powell, Engineer, Signal Metal Industries;

    a. Mr. Powell may testify regarding his involvement in the 2005 Ladle project for Bayou Steel and the 1996 Ladle project for Siemens' predecessor, Voest Alpine. He may also testify regarding the design and manufacture of the Ladles at issue in this case, including design and safety principles used during the ladle project in this case.  Mr. Powell's testimony may also extend to the issue of ladle covers. Address: 850 East Pioneer, Irving, TX  75061

40. James Fortier, Signal Metal Industries;

    a. Mr. Fortier may testify regarding his involvement in the 2005 Ladle project for Bayou Steel and the 1996 Ladle project for Siemens' predecessor, Voest Alpine. He may also testify regarding the design and manufacture of the Ladles at issue in this case, including design and safety principles used during the ladle project in this case.  Mr. Robinson's testimony may also extend to the issue of ladle covers. Address: 850 East Pioneer, Irving, TX  75061

41. Linda Bergeron, Arcelor Mittal Crane Operator;

    a. Ms. Bergeron may testify concerning her observations on the night of the accident, including Mr. Moyer's injuries.

42. Kinley Porter, Arcelor Mittal Employee/United Steelworker's Union President, Local 9121;

    a. Mr. Porter may testify regarding all issues regarding the Plant's safety and health programs during his employment as well as the post-accident investigation conducted by the Plant. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:   Local 9121, P. O. Box 1328, LaPlace, LA 70069

43. Brian Verrette, Arcelor Mittal Management;

    a. Mr. Verrette may testify regarding the amount of medical, funeral, and worker's compensation benefits paid on behalf of Mr. and Mrs. Moyer. Address:   ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

44. James R. Davis, III, Arcelor Mittal LMF Operator;

    a. Mr. Davis may testify regarding the steel production process during his employment at the plant, as well as, his interactions with Sam Moyer and Mr. Moyer's duties as a second helper. Address: 17407 Golf Course Road, Loranger, Louisiana 70446.

45. Joshua Stewart, Arcelor Mittal Security Guard;

    a. May testify regarding medical treatment to Plaintiff. Address: ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

46. Jules Duhe, Arcelor Mittal Maintenance;

    a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

47. Jimmie Pittman, Arcelor Mittal Management;

    a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

48. Keith McGee, Arcelor Mittal Steel Worker;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

49. Travis Miller, Arcelor Mittal Steel Worker;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

50. David Wall, Arcelor Mittal Steel Worker;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

51. Jason Bright, Arcelor Mittal Steel Worker;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

52. Teddy Reynolds, Arcelor Mittal Steel Worker;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

53. Kevin Bailey, Arcelor Mittal Ladleman;

  a. May testify regarding his observations the night of the accident as well as the steel production process during his period of employment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

54. Daniel Vinyard, Arcelor Mittal Management;

  a. May testify regarding the LaPlace plant's management practices, including with regard to safety and health, as well as the steel production process in general. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

39

55. Benjamin Zavala, Arcelor Mittal Management;

    a. May testify regarding the LaPlace plant's management practices, including with regard to safety and health, as well as the steel production process in general. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068.

56. Carlos Hunter, Arcelor Mittal Management;

    a. Mr. Hunter may testify regarding the 2005 ladle purchase from Signal Metal, his engineering background and job duties, and all other equipment and process changes to the plant that he has helped oversee during his tenure at the plant.  Mr. Hunter may also testify about his knowledge and use of auto coupling technology. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

57. Greg Irby, Arcelor Mittal Management;

    a. Mr. Irby may testify regarding his role in ruling out the NARCO stir plugs as a cause of the ladle eruption, as well as, his knowledge of the steel production process throughout his employment in the steel manufacturing industry. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment.

58. J. Cannino, Arcelor Mittal Management;

    a. Mr. Cannino may testify regarding the steel production process during his employment at the LaPlace plant as well as his role in the post-accident investigation. He may also testify regarding feasibility of post-accident modifications and equipment changes, including potential adverse effects of modifications on utility of equipment. Address:  ArcelorMittal, 138 Highway 3217, LaPlace, LA 70068

59. Wendy Stahling, Arcelor Mittal Management;

    a. Ms. Stahling may testify regarding all issues regarding the Plant's safety and health programs during her employment as well as the post-

accident investigation conducted by the Plant. Address: ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

60. Representative of Steel Equipment Specialists LLC, Alliance, Ohio

61. Representative of River Parishes Contractors;

62. Plaintiff reserves the right to offer deposition testimony of any witness previously deposed in the event that the witness is unavailable for trial;

63. Plaintiff reserves the right to call any individual listed in Plaintiff's or Defendants' Discovery Responses;

64. Plaintiff reserves the right to call any witness named by the Defendants;

65. Plaintiff reserves the right to call any witness not yet revealed or who is through further on-going discovery;

66. Plaintiff reserves the right to call any witness needed for impeachment, rebuttal, or to authenticate evidence;

67. Plaintiff reserves the right to call any physician who has treated the Plaintiff.

68. Plaintiff reserves the right to call read into evidence the deposition of any witness deposed in this matter that is shown to be unavailable.

**B.    Defendant, Siemens Industry Inc.:[3]**

**Will Call:**

1. Stuart Brown, Expert Witness – will provide opinions regarding mechanical engineering, patents and technological innovation per his report and deposition testimony;

2. Richard J. Fruehan, Expert Witness will provide opinion regarding state of the art, process engineering, patents and steel technology per his report and deposition testimony;

3. Peter Wimmer, non-reporting Expert Witness-will provide testimony as to mechanical engineering, design engineering, automatic gas coupling design

---

[3] Siemens herein makes a good faith representation of the subject matter of each witness's testimony without intending limit the testimony solely to those areas.  Therefore, Siemens would like to reserve the right to question each witness as to all matters relevant in the case within the witness's personal knowledge, and/or as otherwise allowed by the Federal Rules of Evidence.

and development; and patent analysis from a mechanical engineering and design perspective per his expert designation;

4. Bill King (ArcelorMittal) – will testify regarding his activities and employment at the mill.

5. Larry Taylor (ArcelorMittal) – will testify regarding his activities and employment at the mill.

6. Mike Blessing (ArcelorMittal) – will testify about his post-accident activities and his employment at the mill.

7. Gary Lefko (ArcelorMittal) – will testify about his safety audits, shop floor audits and general mill oversight and responsibilities.

8. Blaine Ockerman(ArcelorMittal)  – will testify regarding his activities and employment at the mill.

9. Jesse Cheramie (ArcelorMittal) – will testify regarding his activities and employment at the mill.

**May Call:**

1.  Bryan Richoux (ArcelorMittal) - may testify regarding his activities and employment at the mill

2.   James Davis (ArcelorMittal) - may testify regarding his activities and employment at the mill

3.  Johannes Rosner (ArcelorMittal) – may testify regarding argon stir station design and safety analyses.

4.  Ed Dee (Signal Metal)– may testify regarding Signal Metal sales practices.

5.  William Mann (Signal Metal)– may testify regarding the design of Ladle # 4.

6.   Gregory Irby (ArcelorMittal)- may testify regarding his activities and employment at the mill.

7.  Wendy Stehling (ArcelorMittal)– may testify regarding her activities and employment at the mill.

8.  Hewlitt Wayne Simmons (ArcelorMittal)–may testify regarding his activities and employment at the mill.

9. Tom Ignatz (Siemens)– may testify regarding his efforts to sell equipment to Bayou Steel.

10. Larry Montani (Siemens)- may testify regarding his efforts to sell equipment to Bayou Steel.

11. Bruce Genter (Siemens)- may testify regarding his efforts to sell equipment to Bayou Steel.

12. Don Watts (Siemens) – may testify regarding Siemens' corporate successor issues and the 1986 Stock Acquisition Agreement.

13. Richard Hall – may testify regarding the 1985 patent and the automatic gas coupling equipment currently in place at ArcelorMittal LaPlace.

14 Siemens reserves the right to offer deposition testimony of any witness previously deposed in the event the witness is unavailable for trial.

15. Siemens reserves the right to call any individual listed in Plaintiff's or Defendants' discovery responses;

16. Siemens reserves the right to call any witness named by the Defendants or Plaintiff.

17. Siemens reserves the right to call any witness not yet revealed or who is revealed through further on-going discovery;

18. Siemens reserves the right to call any witness needed for impeachment, rebuttal, or to authenticate evidence;

19. Siemens reserves the right to read into evidence the deposition of any witness deposed in this matter that is shown to be unavailable;

20. Siemens reserves the right to introduce videotaped testimony during trial.

C.    **Defendant Signal Metal Industries Inc.**

**Will Call:**

1. **William Mann**, Signal Metal's Mechanical Engineer, will testify regarding the design, manufacturing, shipping and/or repair processes for Signal Metal ladles. Address: 850 East Pioneer, Irving, TX  75061

2. **Ed Dee**, Signal Metal's VP of Sales, will testify regarding the sales and bidding processes for Signal Metal ladles. Address:  850 East Pioneer, Irving, TX  75061

3. **Gary Lefko** (deposition), ArcelorMittal USA Chief Technology Officer, will testify regarding ArcelorMittal's acquisition of the Bayou Steel LaPlace facility in 2008, health and safety practices of ArcelorMittal, audits/safety inspections of ArcelorMittal facilities, facility design/layout and equipment at the ArcelorMittal LaPlace facility and the subject accident investigation. Address:  13626 Limerick Drive, St. John, Indiana, 46373

4. **Bryan Richoux**, ArcelorMittal Melt Shop Shift Foreman, Furnace Supervisor, will testify regarding furnace and ladle operations at the ArcelorMittal LaPlace facility and the subject accident. Address:  14765 Kraft Lane, Ponchatoula, Louisiana, 70454

5. **Blaine Ockermann**, ArcelorMittal Health and Safety Supervisor, will testify regarding health and safety practices at ArcelorMittal LaPlace, facility design/layout, equipment and the subject accident investigation. Address:  123 Lynn Drive, Paradis, Louisiana  70080

6. **Greg Irby** (deposition), North American Refractories Company, Inc. (former melter for Bayou Steel and ArcelorMittal LaPlace), will testify regarding facility layout/design and equipment at the Bayou Steel and ArcelorMittal LaPlace facility, furnace and ladle operations and stir plug technology.

7. **Bill King**, ArcelorMittal Management, will testify regarding facility design/layout, equipment and furnace/ladle operations at the ArcelorMittal LaPlace facility and the subject accident investigation. Address:  50606 Creekside Drive, Loranger, Louisiana, 70446

8. **Wendy Stehling**, ArcelorMittal Management, will testify regarding health and safety practices at ArcelorMittal LaPlace and the subject accident investigation. Address:  25 Monte Carlo Drive, Kenner, Louisiana, 70065

9. **Mike Blessing,** ArcelorMittal Management, will testify regarding facility design/layout, equipment and furnace/ladle operations at the ArcelorMittal LaPlace facility and the subject accident investigation. Address:  19421 Camille Lane, Hammond, Louisiana, 70401

10. **Larry Taylor**, ArcelorMittal melt shop engineer/superintendent, will testify regarding the historical operations at Bayou Steel, the purchase, specifications and design/manufacture of the subject Signal Metal ladles, facility operations, equipment and furnace/ladle operations at the ArcelorMittal LaPlace facility and the subject accident investigation. Address:  14170 Hickory Drive, Ponchatoula, Louisiana, 70454

11. **Frank Wisniewski**, expert witness, will provide facts and opinions regarding steel mill melt shop/steelmaking operations, process controls, equipment use

and design and industry standards and all relevant areas as set forth in his report and deposition. Address: 703 Dunbury Court, Seven Fields, PA 16046.

12. **Matthew J.A. Nousak**, P.E., expert witness, will provide facts and opinions regarding ladle design, industry standards, equipment use and manufacture and all relevant areas as set forth in his report and deposition. Address: 4742 Clay Street, Geneva, OH 44041.

13. **John L. Henshaw**, M.P.H., C.I.H, expert witness, will provide facts and opinions regarding workplace safety, OSHA standards and product stewardship and all relevant areas as set forth in his report and deposition. Address: ChemRisk, LLC., 695 Tarpon Bay Road, Suite 8, Sanibel, FL 33957.

14. Any witness needed for authentication of any document or introduction of

documentary evidence into the record.

15. Any witness needed for impeachment or rebuttal.

16. Any witness listed by any other party.

17. Any expert listed by any other party.

**May Call:**

1. **Dee Powell**, Signal Metal's VP Project Management/Estimating, may have knowledge regarding the design, manufacturing, shipping and/or repair processes.  Address:  850 East Pioneer, Irving, TX  75061

2. **Ryan Robinson**, Signal Metal's Co-owner, may have knowledge regarding the design, manufacturing, shipping and/or repair processes. Address:  850 East Pioneer, Irving, TX  75061

3. **Kinley Porter**, United Steelworker's Union President, Local 9121, may have knowledge regarding health and safety practices at the ArcelorMittal LaPlace facility and employer/employee relations as well as the subject accident investigation. Address:  Local 9121, P. O. Box 1328, LaPlace, LA  70069

4. **James R. Davis, III,** ArcelorMittal LMF Operator, may testify regarding the steel production process during his employment at the plant, as well as, his interactions with Sam Moyer and Mr. Moyer's duties as a second helper. Address:  ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

5. **Wiley Thibodeaux,** ArcelorMittal LaPlace, may testify regarding the Melt Shop Production Study, correspondence with Siemens or Voest Alpine and year 2000 Memorandum. Address:   ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

6.  **Benjamin Zavala**, ArcelorMittal Management, may testify regarding the LaPlace plant's management practices, including with regard to safety and health, as well as the steel production process in general. Address: ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

7.  **Carlos Hunter**, ArcelorMittal Management, may testify regarding the 2005 ladle purchase from Signal Metal, his engineering background and job duties, and all other equipment and process changes to the plant that he has helped oversee during his tenure at the plant.  Mr. Hunter may also testify about his knowledge and use of auto coupling technology. Address:  ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

8.  **Alton Davis**, ArcelorMittal (Laplace), may testify regarding melt shop design/layout, equipment, furnace and ladle operations, employee responsibilities and the subject accident investigation. Address: ArcelorMittal, 356 Louisiana 628, LaPlace, LA 70068

9.  **Jesse Cheramie,** ArcelorMittal Machinist, may testify regarding melt shop, furnace and ladle operations and maintenance as well as the subject accident. Address:  308 Davis Drive, Luling, LA   70070

9.  **Johannes Rosner** (deposition), Siemens VAI, corporate representative of the Defendant Siemens Industry Inc., may testify regarding all matters covered in the Rule 30(b)(6) deposition taken in December of 2012.  These areas include, but are not limited to, design and manufacture of the stir station platform at issue in this case.

10. **Peter Wimmer** (deposition), Siemens VAI, corporate representative of Siemens Industry Inc., may testify regarding all matters covered in the Rule 30(b)(6) deposition taken in December of 2012.  These areas include, but are not limited to, the design and manufacture of ladle transfer cars and automatic gas coupling technology.

12. Representative of Representative of **Black Diamond Capital Management L.L.C.**

13. Any other representatives of **Siemens VAI Services, LLC** or any of its successors, assigns or subsidiaries.

14. Any other representatives of **Signal Metal Industries, Inc**. or any of its successors, assigns or subsidiaries.

15. Any other representatives of **Danieli Corporation** or any of its successors, assigns or subsidiaries;

16. Any other representatives of **North American Refractories Co.** or any of its successors, assigns or subsidiaries.

17. Any other representatives of **Arcelor Mittal, S.A.; Arcelor Mittal, LCNA;** or any of their successors, assigns or subsidiaries.

18. Any other representatives of **OSHA** with knowledge of or any other involvement in the inspection(s) and investigation(s) of the subject accident.

19. Representative(s) of any independent or third party laboratories or video forensics companies with knowledge of or any other involvement in the inspection(s) and/or investigation(s) of the subject accident.

20. Representative of **Steel Equipment Specialists LLC**, may testify regarding repairs/retro-fits or other work done at the ArcelorMittal LaPlace facility.

21. Representative of **River Parishes Contractors** may testify regarding repair work performed at the ArcelorMittal LaPlace facility.

22. **J. Cannino**, ArcelorMittal management, may testify regarding the steel production process during his employment at the LaPlace plant as well as his role in the post-accident investigation.

23. **Dorinda Folse**, OSHA Area Director, may testify regarding OSHA regulations and the accident investigation and citation.

24. **Hewlett Wayne Simmons**, ArcelorMittal melter, may testify regarding the steel production process at the LaPlace Steel Plant during his period of employment.

## D.     Intervenor, Arcelor Mittal

**Will Call:**

1. Shannon Gibson of Gallagher Bassett to testify concerning the workers' compensation benefits paid to and on behalf of Samuel Moyer by Arcelor Mittal.

## 14.    JURY STATEMENT

This is a Jury Trial as to all aspects relating to Plaintiff's claims arising under the Louisiana Product Liability Act against Defendants, Siemens Industry Inc. and Signal Metal

Industries Inc.  However, the subrogation claims for reimbursement of worker's compensation benefits sought by the Intervenor, Arcelor Mittal, will be submitted to the Court as a bench trial.

**15.    STATEMENT RELATIVE TO LIABILITY AND DAMAGES:**

This issue of liability will not be tried separately from that of quantum.

**16.    OTHER MATTERS THAT MIGHT EXPEDITE DISPOSITION OF THE CASE:**

**17.    TRIAL DATE AND LENGTH**

The trial shall commence on July 8, 2013 at 8:30 a.m. and should not exceed 10 days.

**18.    FORMULATION OF THE ORDER:**

This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared in person.  Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing.  Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

**19.**    Possibility of settlement was considered. Mediation was held on April 15, 2013. The mediation failed.

Signed this _____ day of _____, 2013  in New Orleans, Louisiana.

_____

**USDC, Honorable Judge Susie Morgan**

Respectfully submitted:

**DAVIS, SAUNDERS & MILLER, PLC**

*/s/  Joseph M. Miller*

_____

**JOSEPH M. MILLER, TA, #30636**

**BENJAMIN B. SAUNDERS #11733**
**CARISA GERMAN-ODEN #31463**
400 Mariners Plaza Drive, Suite 504
Mandeville, Louisiana  70448
Telephone: (985) 612-3070
Facsimile:  (985)612-3072
E-mail: jmiller@davissaunders.com
**Attorneys for Plaintiff, Roxanne Moyer, et al.**

**DUPLASS, ZWAIN, BOURGEOIS,**
**PFISTER & WEINSTOCK**

*s/ Kevin R. Derham*
_____

**DAVID J. BOURGEOIS #1722**
**ANDREW D. WEINSTOCK, TA, #18495**
**KEVIN R. DERHAM, TA #27163**
**ERZSEBET M. PIFKO #33315**
3838 North Causeway Blvd., Suite 2900
Metairie, Louisiana 70002
TELEPHONE:  (504) 832-3700
FACSIMILE:  (504) 837-3119
davidb@duplass.com, aweinstock@duplass.com
kderham@duplass.com, epifko@duplass.com
**Counsel for Defendant, Signal Metal Industries, Inc.**

**LITTLETON JOYCE UGHETTA PARK & KELLY**

*/s/ Joseph Lipari*
_____

**JOSEPH LIPARI, T.A. (*Pro Hac Vice*)**
**ROBERT KELLY (*Pro Hac Vice*)**
39 Broadway, 34th Floor
New York, New York
Telephone: (212) 404-5777
Facsimile: (212) 232-0088
E-mail joseph.lipari@littletonjoyce.com
**Counsel for Defendant Siemens Industry Inc.**

**CHOPIN WAGAR RICHARD & KUTCHER, L.L.P.**

*/s/ Nelson W. Wagar*
_____

**NELSON W. WAGAR #13136**
Two Lakeway Center, Suite 900
3850 North Causeway Blvd.

Metairie, Louisiana 70002
Telephone: (504) 830-3838
Facsimile: (504) 836-9540
E-mail: cwagar@chopin.com
**Counsel for Defendant Siemens Industry Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on June 7, 2013, I electronically filed the foregoing pleading with

the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to

all counsel of record.

/s/ *Joseph M. Miller*
Joseph M. Miller