# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ROXANNE MOYER,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **No. 11-3185** |
| **SIEMENS VAI SERVICES, LLC, et al.,**<br>    **Defendants** | **SECTION "E"** |

## ORDER AND REASONS

Before the Court are two motions for summary judgment: (1) a motion for summary judgment filed by defendant Siemens Industry, Inc. ("Siemens")[1] and (2) a motion for summary judgment filed by defendant Signal Metal Industries, Inc. ("Signal").[2] Plaintiff Roxanne Moyer ("Plaintiff") opposes both motions.[3] Siemens and Signal both filed replies in further support of their respective motions.[4] On April 16, 2013, oral argument was held on Siemens' motion.[5] After oral argument, Siemens and Plaintiff filed supplemental briefs.[6] Finally, on June 4, 2013, Signal filed a supplemental memorandum in further support of its motion for summary judgment,[7] to which Plaintiff responded on June 10, 2013.[8] For the reasons set forth below, both motions are denied in their entireties.

---

[1] R. Doc. 92.

[2] R. Doc. 91.

[3] *See* R. Doc. 110 (Plaintiff's opposition to Siemens' motion); R. Doc. 109 (Plaintiff's opposition to Signal's motion).

[4] *See* R. Doc. 129 (Siemens' reply); R. Doc. 124 (Signal's reply).

[5] R. Doc. 156 (Minute entry from April 16, 2013 oral argument).

[6] R. Doc. 153 (Plaintiff's supplemental brief); R. Doc. 158 (Siemens' supplemental brief).

[7] R. Doc. 184.

[8] R. Doc. 188.

**BACKGROUND**

### I.      Mr. Moyer's Accident

On February 1, 2011, Samuel Moyer ("Mr. Moyer") was killed during an industrial accident at the ArcelorMittal LaPlace steel mill (referred to herein as the "steel mill" or the "steel plant") in LaPlace, Louisiana.  The instant lawsuit arises out of that accident.

Plaintiff, Siemens, and Signal have all presented descriptions of the relevant steelmaking process in this case.  The descriptions provided are essentially the same.  The steel mill produces steel from the melting of scrap metal.  Initially, tons of scrap metal are poured into an Electric Arc Furnace ("EAF") and melted down into molten steel.  The EAF is then "tapped," which involves the opening of a hole in the bottom of the EAF to allow the molten steel to pour into a ladle waiting beneath the EAF.  The ladle sits on a ladle transfer car, which moves along rails embedded in the steel plant floor.  Once the ladle is full, the transfer car moves along those rails to an argon stir station approximately fifty feet away.  The argon stir station is a multilevel work platform embedded into the steel mill's foundation.  At the stir station, argon gas is piped into the ladle through a hole in the bottom of the ladle, and the argon stirs the molten steel to homogenize it and prepare it for further processing.  Once this stirring process is complete, the argon hose must be manually disconnected from the ladle.  To do this, a worker is required to straddle the stir station and the transfer car, with one foot on each, and reach below the ladle to disconnect the argon hose.  After the hose is disconnected, the ladle transfer car takes the ladle to yet another area of the plant for further processing.

On the day in question, Mr. Moyer was working at the steel plant as an ArcelorMittal employee.  At the moment of Mr. Moyer's accident, he was preparing to manually

2

disconnect the argon hose from the ladle, standing with one foot on the stir station and one foot on the transfer car, when the molten steel in the ladle erupted, knocking Mr. Moyer to the floor and covering his body in molten steel.[9] Mr. Moyer sustained severe burns to 100% of his body, and he died some thirty hours after the accident.[10]

While the exact cause of the ladle eruption is not clear, these background facts are not in dispute. For purposes of the instant motions for summary judgment, the ultimate cause of the eruption need not be determined.

## II.    Siemens' Involvement

The steel plant was built by Siemens' predecessor-in-interest, Voest Alpine ("Siemens").[11] Siemens built the steel plant to its own specifications and for its own use.[12] Siemens manufactured the argon stir station and the ladle transfer cars installed in the plant.[13] Siemens has been in the business of manufacturing and selling ladle transfer cars since the 1950s, and it continues to manufacture and sell transfer cars to this day.[14] From the summary judgment evidence, it is unclear whether Siemens is or was in the business of making and selling stir stations. Construction of the steel plant was completed in 1981.[15]

---

[9] *See* R. Doc. 92-10 at ¶ 10 (Siemens' statement of undisputed facts). Plaintiff admits to this fact. *See* R. Doc. 134.

[10] *See* R. Doc. 1 (Complaint).

[11] R. Doc. 92-10 at ¶ 8. Plaintiff admits to this fact. *See* R. Doc. 134.

[12] *See* R. Doc. 92, Ex. C (Bill King Dep. 17:2 - 17:21, Oct. 22, 2012); Doc. 92, Ex. K (Peter Wimmer Aff. ¶¶ 2-3).

[13] *Id.*

[14] *See* R. Doc. 110, Ex. D (Peter Wimmer Dep., 11:2 - 12:12, Dec. 17, 2012) (testimony from Siemens' Rule 30(b)(6) corporate representative); *see also* R. Doc. 110-1 at ¶¶ 13-14. Siemens admits these facts. *See* R. Doc. 129-1.

[15] R. Doc. 92-10 at ¶ 8. Plaintiff admits this fact. *See* R. Doc. 134.

The steel plant began operations that same year.[16]  Siemens owned and operated the plant for a period of approximately five years, when, in 1986, Siemens sold its capital stock in the Louisiana corporation that owned the plant to an entity called Bayou Steel Corporation ("Bayou Steel").[17]  The building and all equipment, including the transfer cars and the stir station, were transferred in the 1986 stock sale.[18]

### III.   Signal's Involvement

Although Siemens built the original ladles installed in the plant,[19] in 2005 Bayou Steel purchased seven replacement ladles from Signal.[20]   Included among these replacement ladles was the ladle involved in the accident at issue in this case.[21]  Larry Taylor, Bayou Steel's lead mechanical engineer, explained that, because he had no technical experience or knowledge in building or designing ladles, he deferred to Signal's design expertise on issues relating to the design of the ladles.[22]  It is undisputed that Bayou Steel specifically requested that Signal provide a ladle that would work with the existing systems in place at the plant in 2005.[23]  It is also undisputed that Bayou Steel did not request that Signal build the ladles so that they could be equipped with or capable of working with

---

[16] *See id.* at ¶ 9.  Plaintiff admits this fact.  *See* R. Doc. 134.

[17] *See id.* at ¶ 11.  Plaintiff admits this fact.  *See* R. Doc. 134.  The stock acquisition agreement is R. Doc. 92, Ex. L.

[18] R. Doc. 92, Ex. L.

[19] *See* R. Doc. 91, Ex. 1 (Larry Taylor Dep., 122:15 - 123:8, Oct. 23, 2012).

[20] *See* R. Doc. 102 at ¶ 7 (Signal's statement of facts).  Plaintiff admits this fact.  *See* R. Doc. 135.

[21] *See* R. Doc. 102 at ¶ 8. Plaintiff admits this fact.  *See* R. Doc. 135.

[22] *See* R. Doc. 91, Ex. 1 (Larry Taylor Dep., 198:3 - 203:8, Oct. 23, 2012).

[23] *See* R. Doc. 102 at ¶ 10. Plaintiff admits this fact.  *See* R. Doc. 135.

automatic gas coupling ("AGC") technology,[24] nor did Bayou Steel request that the ladles be equipped with lids.[25]

In 2008, ArcelorMittal purchased the steel plant from Bayou Steel.[26] ArcelorMittal owned and operated the steel plant at the time of Mr. Moyer's accident, and continues to own and operate the steel plant to this day.

### IV.    The Instant Lawsuit and Relevant Procedural History

Plaintiff filed this lawsuit for damages under the Louisiana Products Liability Act ("LPLA") in December 2011.[27] In her complaint, she named several different entities she claimed were responsible for Mr. Moyer's accident and the damages resulting from that accident,[28] including Siemens, Signal, Danieli Corporation ("Danieli"), North American Refractories Company, Inc. ("NARCO"), and Black Diamond Capital Management, LLC ("Black Diamond"). Plaintiff alleged these entities manufactured various component parts of the steel plant that were: (1) unreasonably dangerous in construction or composition; (2) unreasonably dangerous in design; (3) unreasonably dangerous because adequate warnings about the products had not been provided; and (4) unreasonably dangerous because the

---

[24] Because the process is automatic, AGC technology eliminates the need for the worker to straddle the transfer car and stir station during the disconnection of the stir hose. *See, e.g.,* R. Doc. 110-1 at ¶¶ 18-19, 23-25 (Plaintiff's statement of facts). Siemens admits these facts. *See* R. Doc. 129-1.

[25] *See* R. Doc. 102 at ¶ 11. Plaintiff admits this fact. *See* R. Doc. 135.

[26] *See* R. Doc. 110-1 at ¶ 4. Siemens admits this fact. *See* R. Doc. 129-1.

[27] *See* R. Doc. 1 (Complaint); *see also* R. Doc. 59 (Amended Complaint).

[28] Plaintiff seeks, from all defendants, the following survival action damages on behalf of Mr. Moyer: (1) conscious physical pain and suffering; (2) conscious mental pain and suffering; (3) medical expenses; and (4) funeral expenses. Plaintiff also seeks the following wrongful death damages on her own behalf: (1) loss of love; (2) loss of affection; (3) loss of services; (4) loss of support; (5) loss of society; and (6) grief.

products did not conform to an express warranty of the manufacturer.[29]   Plaintiff voluntarily dismissed her claims against Danieli,[30] Black Diamond,[31] and NARCO,[32] leaving Siemens and Signal as the only defendants.   She also voluntarily dismissed certain of her LPLA claims,[33] leaving only two: (1) her claim that the products at issue were unreasonably dangerous in design; and (2) her claim that the products at issue were unreasonably dangerous because an adequate warning about the products had not been provided.

Plaintiff claims that Siemens was the manufacturer of the stir station and transfer car for LPLA purposes, and that the stir station and transfer car were products for LPLA purposes.[34]   Plaintiff further alleges that the stir station and transfer car were (1) unreasonably dangerous in design and (2) unreasonably dangerous because an adequate warning about the products had not been provided.   Specifically, Plaintiff alleges that Siemens' failure to equip the stir station with shielding and the transfer car with AGC technology made those pieces of equipment unreasonably dangerous in design, and that Siemens failed to provide an adequate warning to Bayou Steel and/or ArcelorMittal of the dangers of using the stir station without shielding and transfer car without AGC technology.

Plaintiff claims that Signal was the manufacturer of the ladle for LPLA purposes, and that the ladle was a product for LPLA purposes.   She claims that the ladle was (1)

---

[29] R. Doc. 1.

[30] R. Doc. 64.

[31] R. Doc. 67.

[32] R. Doc. 82.

[33] R. Doc. 80.

[34] *See* R. Doc. 59 (Amended Complaint against Siemens, clarifying which products Plaintiff claims were manufactured by Siemens).

unreasonably dangerous in design and (2) unreasonably dangerous because an adequate warning about the ladle was not provided.  Specifically, Plaintiff argues that Signal's failure to equip the ladle with AGC technology and/or a lid made the ladle unreasonably dangerous in design, and that Signal failed to provide an adequate warning to Bayou Steel and/or ArcelorMittal of the dangers of using ladles without AGC technology and/or lids.

ARGUMENTS OF THE PARTIES

### V.    Siemens' Motion for Summary Judgment

Siemens has moved for summary judgment seeking dismissal of all Plaintiff's claims asserted against it.  Siemens asserts four arguments in support of its motion.  Siemens' first argument is that Plaintiff's claims are barred by the Louisiana statute of repose.  Siemens' second argument is that it is not a "manufacturer" and the stir station and transfer car are not "products" for LPLA purposes.  Siemens' third argument is that Plaintiff cannot prove the stir station or transfer car were unreasonably dangerous in design because she cannot show an alternate design existed at the time the products left Siemens' control that was capable of preventing or reducing the risk of Plaintiff's claimed damages.  Siemens also states that, even if such an alternative design did exist, Plaintiff cannot show the likelihood either product's design would cause those damages, coupled with the gravity of those damages, outweighed the burden on Siemens of adopting such alternative designs and the adverse effect the alternative design would have on the products.  Finally, Siemens' fourth argument is that Siemens had no duty to warn Bayou Steel or ArcelorMittal of the dangers of using the stir station and/or the transfer car because Bayou Steel and/or ArcelorMittal are sophisticated users well aware of those dangers.  Siemens also contends that, even if it did have a duty to warn, the fact that Plaintiff has not offered any alternative warnings is

fatal to her inadequate warning claim.

Plaintiff argues that Siemens waived its statute of repose defense with respect to the transfer car,[35] and that, even if Siemens did not waive its statute of repose defense, the statute of repose does not apply in this case.  Plaintiff next disagrees with Siemens' argument that the stir station and transfer car are not products under the LPLA and that Siemens is not a manufacturer under the LPLA.  Plaintiff further contends that the issue of whether she can satisfy the requirements of either of her LPLA claims involves questions of fact, and, because disputed issues of material fact exist on both her LPLA claims, summary judgment is unavailable to Siemens.  Finally, Plaintiff responds that Siemens is not entitled to the "sophisticated user defense" to her inadequate warning claim.

## VI.    Signal's Motion for Summary Judgment

Signal argues that there are no genuine issues of material fact and that both of Plaintiff's LPLA claims against Signal fail as a matter of law.[36]  Signal contends that, when Bayou Steel ordered new ladles from Signal in 2005, it did not request ladles equipped with AGC technology or lids, and thus Signal has no liability as a manufacturer because it produced the product as it was ordered.  Moreover, Signal argues neither AGC technology nor ladle lids were feasible alternative designs to the ladles Signal produced.  Signal further argues, as did Siemens, that it had no duty to warn Bayou Steel and/or ArcelorMittal of the dangers of using ladles without lids and/or ladles not equipped with AGC technology.[37]

---

[35] Plaintiff does not claim Siemens waived its statute of repose defense with respect to the stir station.

[36] In the summary judgment motion, Signal does not contest Plaintiff's assertion that Signal was a manufacturer under the LPLA or that the ladle was a product under the LPLA.

[37] Signal does not argue that it gave the steel plant an adequate warning, instead relying on the argument that it owed no duty to warn in the first place.

Finally, Signal argues that because Plaintiff has no qualified expert who can testify in support of her inadequate warning claim,[38] her inadequate warning claim must fail.

Plaintiff argues that disputed issues of fact preclude the entry of summary judgment in Signal's favor on either of her LPLA claims.  She also argues that expert testimony is not required to establish an inadequate warning claim under the LPLA.

## APPLICABLE LAW

### VII.   Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 ; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  If the moving party fails to carry this burden, the motion must be denied.  If the moving party successfully carries this burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-23.  Once the burden has shifted, the non-moving party must direct the Court's attention to something in the pleadings or other evidence in the record that sets

---

[38] Signal filed a motion *in limine* seeking, *inter alia*, to preclude Plaintiff's expert Frank Dietrich from offering any expert opinions in support of Plaintiff's inadequate warning claim.  *See* R. Doc. 93.  The Court will address Signal's motion *in limine* by separate order.

forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist. *Id.* at 324. The non-moving party cannot simply rely on allegations or blanket denials of the moving party's pleadings as a means of establishing a genuine issue of material fact, but instead must identify specific facts that establish a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). Likewise, an affidavit cannot be used to preclude summary judgment unless its contains competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). "[A] self-serving affidavit, without more evidence, will not defeat summary judgment." *Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346-47 (5th Cir. 2011) (citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 & n.49 (5th Cir. 2005)); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996). If the dispositive issue is one on which the non-moving party will bear the burden of proof at trial, however, the moving party may satisfy its burden by simply pointing out that the evidence in the record is insufficient with respect to an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 325.

"An issue is material if its resolution could affect the outcome of the action." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also*

10

*Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150-51 (2000).   All reasonable inferences are drawn in favor of the non-moving party.   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).   There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.   *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

## VIII.   Choice of Law

Because the Court is sitting in diversity, the Court applies the substantive law of Louisiana, the forum state.   *See, e.g.,   Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).   The parties agree Louisiana law governs this case.

## IX.   The Louisiana Products Liability Act Generally

The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." LA. REV. STAT. ANN. § 9:2800.52.   A plaintiff "may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability not set forth in the LPLA." *Jefferson v. Lead Industries Ass'n, Inc.*, 106 F.3d 1245, 1248 (5th Cir. 1997).   Louisiana Revised Statute 9:2800.53(1) defines a "manufacturer" as a "person or entity who is in the business of manufacturing a product for placement into trade or commerce."   Louisiana Revised Statute 9:2800.53(3) defines a "product" as "a corporeal movable that is manufactured for placement into trade or commerce, including a product that forms a component part of or that is subsequently incorporated into another product or an immovable."   The LPLA does not define "placement into trade or commerce."

The LPLA establishes the framework in which a manufacturer may be held liable for

11

damages caused by its products:

A.   The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

B.   A product is unreasonably dangerous if and only if:

(1)   The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2)   The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3)   The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4)   The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C.   The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer.  The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

LA. REV. STAT. ANN. § 9:2800.54(A)-(C).   As a general matter, whether a product was "unreasonably dangerous" for purposes of § 9:2800.54(B) is an issue of fact.  *See Morris v. United Servs. Auto Ass'n*, 32,528 (La. App. 2 Cir. 2/18/00); 756 So.2d 549, 557  (citing *Hines v. Remington Arms Co.*, 94-455 (La. 12/8/94); 648 So.2d 331, 335; *Taylor v.*

*American Laundry Mach., Inc.*, 27121-CA, (La. App. 2 Cir. 6/23/95); 658 So.2d 288, 291,

*writ denied*, 95-1877 (La. 11/3/95); 661 So.2d 1385).

## ANALYSIS

**X.     Plaintiff's LPLA Claim Against Siemens**

      **A.     Is Siemens Entitled to Summary Judgment on its Status as a Manufacturer for LPLA Purposes?**

          **1.     The Definition of Manufacturer Under the LPLA**

The Fifth Circuit has listed the elements of a products liability cause of action under the LPLA as the following:

> 1.   that the defendant is a **manufacturer of the product**;
>
> 2.   that the claimant's damage was proximately caused by a characteristic of the product;
>
> 3.   that the characteristic made the product unreasonably dangerous in one of the four ways provided in the statute; and
>
> 4.   that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.

*Jefferson*, 106 F.3d at 1251 (emphasis added).  Louisiana Revised Statute 9:2800.53(1) defines a "manufacturer" as a "person or entity who is in the business of manufacturing a product for placement into trade or commerce."  At trial, the burden of proving the elements of an LPLA claim falls on the party asserting the LPLA claim.  LA. REV. STAT. ANN. § 9:2800.54(D).

          **2.     Siemens is Not Entitled to Summary Judgment on its Status as a Manufacturer for LPLA Purposes**

At the trial of this case, Plaintiff will have the burden of proving that Siemens is a

manufacturer for LPLA purposes.  More specifically, Plaintiff must show that Siemens is or was in the business of manufacturing and selling stir stations and transfer cars.  To prevail on summary judgment, Siemens has the burden of pointing to specific evidence in the record demonstrating that Plaintiff will not be able to meet her burden at trial.  Siemens argues that it has done this by pointing to the undisputed fact that it built the transfer car and stir station for its own use, and says, as a result, that Plaintiff cannot prove at trial that Siemens is a manufacturer under the LPLA.  But Siemens has misstated Plaintiff's burden of proof at trial on the issue of Siemens' status as a manufacturer.  All Plaintiff has to prove is that Siemens is and/or was in the business of manufacturing and selling transfer cars and/or stir stations.  If so, Siemens is a manufacturer under the LPLA regardless of whether the particular equipment at issue was built for Siemens' own use.

It is true that an entity building a product for its own use, which is not in the business of manufacturing and selling that particular product, is not a manufacturer of the product.  In *Singletary v. Crown Zellerbach*, 607 So.2d 804 (La. App. 1 Cir. 1992), the Louisiana First Circuit Court of Appeal held that a sub-lessee of real property that built a gate for its own use was not a manufacturer under the LPLA.  The sub-lessee was sued after a group of children riding an all-terrain vehicle crashed into a gate the sub-lessee built on the property with the lessor's permission.  *Id.* at 806-07.  One of the plaintiffs' allegations against the sub-lessee was that it was liable under the LPLA as "manufacturer" of the gate. *Id.*  The appellate court rejected this contention, stating that because the sub-lessee built the gate for its own use, and did not place the gate into the "stream of commerce," it was not a manufacturer for LPLA purposes.  *Id.* at 809.  Importantly, the sub-lessee was not in the business of building and selling gates, and its one-time manufacture of a gate for its own

use did not make it a manufacturer for LPLA purposes.

The Second Restatement of Torts, the version of the Restatement in use at the time the LPLA was enacted, supports this position. The Restatement explains the imposition of liability in the products liability context as follows:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a)   the seller is engaged in the business of selling such a product, and
>
> (b)   it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). Comment (f) to this Restatement section further explains the requirement that a person be in the "business of selling":

> The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.
>
> The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance

15

> upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2-314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.

*Id.* at cmt. (f).[39]   The Louisiana legislature drew heavily from the Second Restatement for guidance in enacting the LPLA.  *See, e.g.,* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L. REV. 565, 566 n. 4 & 572 n. 28 (1989).  As Professor Thomas Galligan, Jr. explained, courts are to "avoid an interpretation of the [LPLA] that is contrary to generally accepted principles of products liability law." Thomas Galligan, Jr., *The Louisiana Products Liability Act: Making Sense of it All*, 49 LA. L. REV. 629, 637 (1989).  The Court, finding the approach taken by the Restatement to be a generally accepted principle of products liability law, will apply the clear language of the LPLA in a way that conforms to this generally accepted principle.  The Court finds that an entity in the business of manufacturing and selling a product is a manufacturer for LPLA purposes even

---

[39] The Third Restatement of Torts, promulgated after the enactment of the LPLA, reiterates the requirement that an entity be in the "business of selling" a thing before the entity may be held liable under products liability law for damages caused by the thing.  *See* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 1 (1998) ("One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect."); *see also id.* at cmt. (c) ("The rule stated in this Section applies only to manufacturers and other commercial sellers and distributors who are engaged in the business of selling or otherwise distributing the type of product that harmed the plaintiff. The rule does not apply to a noncommercial seller or distributor of such products. It is not necessary that a commercial seller or distributor be engaged exclusively or even primarily in selling or otherwise distributing the type of product that injured the plaintiff, so long as the sale of the product is other than occasional or casual. However, the rule does not cover occasional sales (frequently referred to as "casual sales") outside the regular course of the seller's business.").

though the particular item at issue was built for the entity's own use.  The definition of a product under the LPLA does not add an additional requirement that the particular item causing the harm have been manufactured for placement into trade or commerce.[40]

The Court finds that Siemens has not met its burden at the summary judgment stage of demonstrating that Plaintiff will not be able to meet her burden of establishing that Siemens did not manufacture the transfer car and stir station.  In fact, the undisputed evidence is that Siemens was and is in the business of manufacturing and selling ladle transfer cars,[41] so it appears that Plaintiff will be able to meet her burden on this element. Siemens produced no evidence in the record with respect to whether Siemens was or is in the business manufacturing and selling of stir stations, so Siemens still has not met its burden.

Accordingly, to the extent Siemens' motion for summary judgment seeks judgment as a matter of law that it is not a manufacturer for LPLA purposes, Siemens' motion for summary judgment is denied.

### B.  Is Siemens Entitled to Summary Judgment on Plaintiff's Alternative Design Claim?

#### 1.  Elements of an LPLA Claim Based on Alternative Design

Louisiana Revised Statute 9:2800.56 provides that:

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1)    There existed an alternative design for the

---

[40] Neither does the fact that Siemens may have made minor adjustments to customize the product to meet each customer's needs change the result.

[41] *See* R. Doc. 110-1 at ¶¶ 13-14.

> product that was capable of preventing the
> claimant's damage; and
>
> (2)   The likelihood that the product's design would
>        cause the claimant's damage and the gravity of
>        that damage outweighed the burden on the
>        manufacturer of adopting such alternative design
>        and the adverse effect, if any, of such alternative
>        design on the utility of the product. An adequate
>        warning about a product shall be considered in
>        evaluating the likelihood of damage when the
>        manufacturer has used reasonable care to
>        provide the adequate warning to users and
>        handlers of the product.

LA. REV. STAT. ANN. § 9:2800.56.   As the Court of Appeal of Louisiana, Second Circuit,

explains, a products liability claimant asserting a design defect claim under § 9:2800.56,

having established that the damage arose from a reasonably anticipated use of the

product,[42] must prove three elements:

> First, he must prove that another way to design the product
> existed at the time the manufacturer placed the chosen design
> on the market.
>
> Next he must prove that the alternative design was capable or
> would have been "significantly less likely" than the chosen
> design to cause the claimant's complained of damages, or that
> the alternative design would have significantly reduced such
> damage.
>
> Finally, the claimant must prove that, at the time the product
> left the manufacturer's control, the likelihood that the product
> as designed would cause the claimant's damage and the gravity
> of that damage outweighed the burden on the manufacturer of
> adopting the alternative design identified by claimant, and the
> adverse effect, if any, this different mode of design would have
> on the products utility.

*Johnson v. Black & Decker U.S., Inc.*, 29,996 (La. App. 2 Cir. 10/31/97); 701 So.2d 1360,

---

[42] Siemens does not contend in this summary judgment motion that Plaintiff cannot establish that
Mr. Moyer's accident arose from a reasonably anticipated use of the stir station or transfer car.

1363, *writ denied*, 1997-2971 (La. 2/6/98); 709 So.2d 741 (internal citations omitted). "The existence of each of these elements is a question of fact or of mixed fact and policy to be decided by the jury based upon the evidence and circumstances presented by the particular case." *Ellis v. Weasler Engineering Inc.*, 258 F.3d 326, 332 (5th Cir. 2001) (internal citations omitted).

With respect to the first element of this test, the plaintiff's burden is not to show that an alternative design capable of preventing the damage was "feasible," but instead simply to show that the alternative design was "in existence" at the time the product left the manufacturer's control. *See, e.g., Sisk v. Sears, Roebuck & Co.*, 959 F. Supp. 337, 339 (E.D. La. 1996) (citing *Lavespere v. Niagara Machine and Tool Works, Inc.,* 910 F.2d 167, 179–81 (5th Cir. 1990); *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590 (5th Cir. 1994)). Kennedy explained this first element in his *Primer* article:

> "Existed" does not mean that the alternative design must have been manufactured and in actual use when the manufacturer distributed his product. Nor does it mean that that alternative design must have been feasible, i.e., could have been employed even if it was not, at that time. But "existed" does mean that the alternative design must have at least been conceived at the time the product left its manufacturer's control, because one of the purposes of the first element of section 2800.56 (when read with section 2800.59(A)) . . . is to show that the manufacturer had a realistic choice as to design).

49 LA. L. REV. at 596.

With respect to the second element, the plaintiff need not show that the alternative design would have prevented the damages, just that the alternative design would have made the damage significantly less likely. *See Wilson v. Hovart Corp.*, No. 95-2279, 1996 WL 117502, at *3 (E.D. La. Mar. 15, 1996).

With respect to the third element of the alternative design test, commonly referred

19

to as the "risk-utility balancing test," *see, e.g., Perez v. Brown Mfg.*, No. 98-478, 1999 WL 527734, at *4 (E.D. La. July 21, 1999) ("*Perez I*"), the claimant's burden is to show that at the time the product left the manufacturer's control, the likelihood that the product as designed would cause the damages alleged, coupled with the gravity of those damages, outweighed the burden on the manufacturer of adopting the alternative design, coupled with the adverse effect, if any, the alternative design would have on the product's utility. *Johnson,* 701 So.2d at 1363.

### 2.   Siemens is Not Entitled to Summary Judgment on Plaintiff's Alternative Design Claim

Siemens contends that there are no issues of material fact relating to the alternative design claim and that it is entitled to judgment as a matter of law because Plaintiff will not be able to meet her burden of proof at trial.  The Court finds that there are disputed issues of material fact with respect to whether shielding and AGC technology "existed" at the time the stir station and transfer car left Siemens' control, as well as whether those technologies were capable of preventing or reducing the risk of Plaintiff's damages.  The Court also finds there are genuine issues of material fact that must be resolved before the risk-utility balancing test can be applied to the alternative design claim asserted against Siemens, as it is unclear from the record evidence whether the burden of implementing AGC technology and/or shielding, coupled with any negative effect those technologies would have on the equipment's utility, outweighed the risk of using the equipment without those technologies and the gravity of the harm that could occur as a result of that risk. Because genuine issues of fact exist with respect to all three elements of the alternative design claim asserted against Siemens regarding the stir station and transfer car, the Court finds that Siemens is not entitled to judgment as a matter of law that Plaintiff has no alternative design claim

20

under the LPLA.

Accordingly, to the extent Siemens' motion for summary judgment seeks judgment as a matter of law regarding Plaintiff's alternative design claim, Siemens' motion is denied.

### C.    Is Siemens Entitled to Summary Judgment on Plaintiff's Inadequate Warning Claim?

#### 1.    Elements of an LPLA Claim Based on Inadequate Warning

Louisiana Revised Statute 9:2800.57 provides that:

> A.    A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

LA. REV. STAT. ANN. § 9:2800.57(A).  The statute further provides that:

> A manufacturer is not required to provide an adequate warning about his product when:
>
> (1)    The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
>
> (2)    The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

*Id.* at § 9:2800.57(B).  Finally, the statute imposes on a manufacturer a continuing duty to warn, stating that if the manufacturer acquires "knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer," the manufacturer "is

21

liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." *Id.* at § 2800.57(C).  The LPLA defines an "adequate warning" as "a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made." *Id.* at § 9:2800.53(9).

"An essential element of plaintiff's failure to warn claim is that there be some reasonable connection between the manufacturer's omission and the damage which plaintiff suffered." *Perez I*, 1999 WL 527734, at *7 (citing *Delery v. Prudential Ins. Co.*, 94-352 (La. App. 4 Cir. 9/29/94); 643 So.2d 807, 814, *writ denied*, (La. 12/16/94); 648 So.2d 393). Whether one owes a duty to warn is ordinarily a question of law; whether or not a particular warning is adequate is a question of fact.  *Id.* (citing *Phillips v. K–Mart Corp.*, 588 So. 2d 142 (La. App. 3 Cir. 1991); *Bloxom v. Bloxom*, 512 So.2d 839, 844 (La. 1987)). With respect to the so-called "sophisticated user" affirmative defense set forth in § 9:2800.57(B)(2), however, "if reasonable minds could differ on th[e] question" of whether the manufacturer "knew or reasonably should have been expected to know of the dangerous characteristic of the product that caused the damage," the question of whether the manufacturer owed a duty to warn must be submitted to the jury with a proper instruction. *Swope v. Columbian Chems. Co.*, 281 F.3d 185, 206 (5th Cir. 2002). In determining whether a particular warning is adequate, the trier of fact considers the following factors:

> [1] the severity of the danger, [2] the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, [4] the intensity and the form of the warning, and [5] the cost

of improving the strength or mode of the warning.

*Bloxom*, 512 So.2d at 844.

### 2. Siemens is Not Entitled to Summary Judgment on Plaintiff's Inadequate Warning Claim

Siemens' argument with respect to Plaintiff's inadequate warning claim is two-fold. First, Siemens argues that it had no duty to warn of the dangers of using manual coupling technology instead of AGC technology on ladle transfer cars because Bayou Steel, and later ArcelorMittal, were sophisticated users who "knew or reasonably should have been expected to know" that manual coupling technology was a dangerous characteristic of Siemens' transfer car. See LA. REV. STAT. ANN. § 9:2800.57(B)(2). As explained above, this is an affirmative defense for the manufacturer, and thus, for purposes of Siemens' summary judgment motion, the burden of demonstrating a lack of disputed issues of material fact rests with Siemens. Siemens' second argument is that, even if it did have a duty to warn Bayou Steel and/or ArcelorMittal of those dangers, Plaintiff's failure to offer an alternative warning means that she cannot prove her inadequate warning claim.

Plaintiff's burden at trial will be to show that the stir station and transfer car possessed a "characteristic that may cause damage" at the time they left Siemens' control and that Siemens "failed to use reasonable care to provide an adequate warning" of such characteristic and its danger to Bayou Steel. She may also prove at trial that, even if Siemens did not have knowledge of the dangerous characteristic when the products left its control, it later acquired knowledge of that characteristic or should have acquired knowledge of the characteristic, but failed to use reasonable care to provide an adequate warning of that characteristic and its danger to Bayou Steel and/or ArcelorMittal. The burden of proving that any warnings Siemens did give to Bayou Steel or ArcelorMittal were

inadequate falls on Plaintiff, as does the burden of demonstrating a reasonable connection between Siemens omission and Plaintiff's damages.  With respect to Plaintiff's inadequate warning claim, Siemens' summary judgment burden is to direct the Court's attention to specific evidence in the record demonstrating that Plaintiff will not be able to meet her burden at trial.

As with Plaintiff's alternative design claim, Siemens has failed to carry its burden of demonstrating a lack of disputed issues of material fact with respect to Plaintiff's inadequate warning claim.  Indeed, Siemens does not even address the elements Plaintiff will need to prove at trial to succeed on her inadequate warning claim, let alone direct the Court's attention to any specific record evidence establishing a lack of material facts relating to any of those elements.  Accordingly, to the extent Siemens' motion for summary judgment seeks judgment as a matter of law regarding Plaintiff's inadequate warning claim, Siemens' motion is denied.

### 3.    Siemens is Not Entitled to Summary Judgment on its Sophisticated User Affirmative Defense

With respect to its sophisticated user affirmative defense set forth in Louisiana Revised Statute 9:2800.57(B)(2), Siemens' burden at the summary judgment stage is to demonstrate a lack of disputed issues of material fact with respect to whether the user or handler of the product already knows or reasonably should be expected to know the characteristic of the product that may cause damage and the danger of such characteristic. Plaintiff has the burden of directing the Court's attention to specific evidence in the record demonstrating that Siemens will not be able to carry its burden at trial.

The Court finds that Siemens has not carried its burden of demonstrating that there are no genuine issues of material fact and that it is entitled to the protections of the

sophisticated user defense as a matter of law.  Siemens has not established, by undisputed facts, that Bayou Steel knew or should have known that using stir stations without shielding and transfer cars equipped with manual coupling technology was less safe than stir stations with shielding and transfer cars equipped with AGC technology.  Nor has Siemens established that Bayou Steel knew or should have known that its decision to use a stir station without shielding and a transfer car without AGC technology could cause harm.

Indeed, the evidence demonstrates that, while Bayou Steel was aware of the potential danger for ladle eruptions,[43] and Bayou Steel was aware of shielding and AGC technology at some point prior to Mr. Moyer's accident,[44] the plant had never experienced an accident like Mr. Moyer's and thus may not have known using stir stations without shielding and transfer cars with manual coupling technology instead of AGC technology could cause a fatal accident.  There are disputed issues of fact as to whether Bayou Steel had knowledge of the risks and benefits associated with these alternative technologies and as to whether Bayou Steel made a conscious decision not to implement these technologies even though they were the safest available technologies.

It also is not clear whether Siemens acquired knowledge of these dangerous characteristics before or after the stir station or transfer car left Siemens' control.  As a result, it is not clear whether Siemens owed Bayou Steel and/or ArcelorMittal a continuing duty to warn of those dangerous characteristics even after the products left Siemens' control.  *See* LA. REV. STAT. ANN. 9:2800.57(C).  If Siemens acquired knowledge of those dangerous characteristics after ArcelorMittal bought the plant, it would have a continuing

---

[43] *See* R. Doc. 92-3 at ¶ 21.  Plaintiff admits this fact.  *See* R. Doc. 134.

[44] *See* R. Doc. 92, Ex. N (Larry Taylor Dep., 65:12 - 66:22, Oct. 23, 2012).

duty to warn, but if ArcelorMittal knew or should have known of the dangers associated with using stir stations without shielding and transfer cars equipped with manual coupling technology instead of AGC technology, Siemens may be shielded by the sophisticated user affirmative defense.  Because these factual issues are in dispute, it cannot be said that Siemens was relieved of its continuing duty to warn ArcelorMittal of these dangers because of the sophisticated user defense as a matter of law.

Because reasonable minds could differ on the question of whether Bayou Steel and/or ArcelorMittal knew or should have known of these dangers at any relevant time, the question of whether Signal is entitled to the protection of the sophisticated user affirmative defense must be resolved by the jury after trial.  *Swope*, 281 F.3d at 206.  To the extent Signal's motion for summary judgment seeks judgment as a matter of law on its sophisticated user defense, Siemens' motion is denied.

**D.   Is Siemens Entitled to Summary Judgment that the Louisiana Statute of Repose Bars Plaintiff's LPLA Claims?**

Siemens argues that because both the stir station and the transfer car were improvements to immovable property built pursuant to a construction contract, the Louisiana statute of repose bars Plaintiff's suit in its entirety.

**1.   The Louisiana Statute of Repose**

The applicable version of the statute of repose, Louisiana Revised Statute § 9:2772, provides in part as follows:

> A.   No action, whether ex contractu, ex delicto, or otherwise, to recover on a contract or to recover damages shall be brought . . . against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property:

    (1)    More than ten years[45] after the date of registry in the mortgage office of acceptance of the work by owner; or

    (2)    If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than five years after the improvement has been thus occupied by the owner.

***

B.    (1)    The causes which are perempted within the time described above include any action:

    (a)    For any deficiency in the performing or furnishing of land surveying services . . . including but not limited to those preparatory to construction or in the design, planning, inspection, or observation of construction, or in the construction of any improvement to immovable property, including but not limited to any services provided by a residential building contractor . . .

    (b)    For damage to property, movable or immovable, arising out of any such deficiency.

    (c)    For injury to the person or for wrongful death arising out of any such deficiency.

    (d)    Brought against a person for the action or failure to act of his employees.

    (2)    Deficiency, as used in this Section, includes failure to warn the owner of any dangerous or hazardous condition, regardless of when

---

[45] The current version of the statute of repose provides for a five year peremptive period.  At the time the stir station and transfer cars were installed at the steel plant, the statute provided for a ten year peremptive period.

> knowledge of the danger or hazard is obtained or
> should have been obtained.

LA. REV. STAT. ANN. § 9:2772.  The statute of repose in effect in 1981 "precludes any suit based on the allegedly defective design or construction of an immovable from being brought more than ten years after the completion of the work performed."  *Harris v. Black Clawson Co.*, 961 F.2d 547, 552 (5th Cir. 1992).

As a threshold matter, a defendant "must show that it was a contractor for the statute [of repose] to apply." *Summerfield v. Harnischfeger Indus., Inc.*, No. 97-3638, 1998 WL 726080, at *4 (E.D. La. Oct. 13, 1998) (Vance, J.) (citing *Jones v. Crane Co.*, 26,781 (La. App. 2 Cir. 4/5/95); 653 So.2d 822, 826; *DeWoody v. Citgo Petroleum Corp.*, 604 So.2d 92, 99 (La. App. 3 Cir. 1992)); *see also Tenneco Oil Co. v. Chicago Bridge & Iron Co.*, 495 So.2d 1317 (La. App. 4 Cir. 1986), *writ denied*, 497 So.2d 1015 (La. 1986); *Bunge Corp. v. GATX Corp.*, 557 So.2d 1376 (La. 1990); *Burmaster v. Gravity Drainage Dist. No. 2 of St. Charles Parish,* 366 So.2d 1381, 1386 (La. 1978).  A "contractor" is "one who contracts to do work or provide supplies for another." BLACK'S LAW DICTIONARY (9th ed. 2009).  Upon establishing that it is a contractor, a defendant may enjoy the protection of the Louisiana statute of repose if it can show: (1) that the products were improvements to immovable property; and (2) that it manufactured the products pursuant to a construction contract as opposed to a sales contract. *Summerfield*, 1998 WL 726080, at *2 (citing *Smith v. Arcadian Corp.,* 95-97 (La. App. 3 Cir. 5/31/95); 657 So.2d 464, 467–69; *DeWoody*, 604 So.2d at 99).  The burden of demonstrating the applicability of the statute of repose falls on the defendant seeking to invoke its protections.  *See, e.g., DeWoody*, 604 So.2d at 99.

### 2. Siemens is Not Entitled to Summary Judgment that Plaintiff's Claims are Barred by the Statute of Repose

As explained above, Siemens built the steel plant, including the stir station and transfer car, for its own use. Siemens did not build the plant or either piece of equipment pursuant to a contract with a third party. Thus, Siemens is not a contractor. Because it is not a contractor, Siemens is not entitled to the protections of the Louisiana statute of repose in Louisiana Revised Statute 9:2772. *Summerfield*, 1998 WL 726080, at *4. The Court need not consider whether the transfer car was an improvement to immovable property[46] or whether the 1986 stock acquisition agreement was a contract to build or a contract of sale. Likewise, the Court need not consider Plaintiff's argument that Siemens waived its statute of repose defense.

Accordingly, to the extent Siemens' motion for summary judgment seeks judgment as a matter of law that Plaintiff's claims are barred by the Louisiana statue of repose, the motion is denied.

### XI. Plaintiff's LPLA Claim Against Signal

#### A. Signal is Not Entitled to Summary Judgment on Plaintiff's Alternative Design Claim

Plaintiff claims that one of the ladles Signal sold to Bayou Steel in 2005 was unreasonably dangerous in design and was unreasonably dangerous because Signal failed to provide an adequate warning of the ladle's dangerous characteristics. Signal's motion for summary judgment contends that there are no genuine issues of material fact and that

---

[46] Plaintiff and Siemens agree that the stir station was an improvement to immovable property.

29

both of Plaintiff's LPLA claims regarding the ladle fail as a matter of law.[47]

Signal moved for summary judgment regarding Plaintiff's alternative design claim with respect to the ladle on the grounds that there are no genuine issues of material fact and Plaintiff will not be ale to meet her burden of proof at trial.[48]  Plaintiff responds that there are disputed issues of material fact.  The Court agrees with Plaintiff and finds there are disputed issues of material fact with respect whether lids and/or AGC technology were capable of preventing or reducing the risk of Plaintiff's damages as they relate to the ladle.  Both parties have directed the Court's attention to conflicting testimony regarding this issue.[49]  The Court also finds there are genuine issues of material fact that must be decided before application of the risk-utility balancing test as it relates to the ladle.  Signal has directed the Court's attention to evidence in the record indicating that installing lids on the ladles it sold to Bayou Steel would have been difficult and would have had a negative effect on the ladles' utility.[50]  Plaintiff has directed the Court's attention to evidence in the record indicating that the burden on Signal of installing AGC technology on the ladles would have been minimal when compared with the likelihood that a ladle without such technology could cause serious damage.[51]

---

[47] Signal does not argue that it or its product falls outside the definitions set forth in the LPLA, nor does it argue that the statute of repose bars Plaintiff's claims.

[48] *See supra* section X.B.1 (discussion of applicable law and burdens of proof with respect to an alternative design claim under the LPLA).

[49] *Compare, e.g.,* R. Doc. 91, Ex. 1 (Larry Taylor Dep., 101:18 - 102:23, Oct. 23, 2012) *with* R. Doc. 109, Ex. M (Matt Nousak Dep., 102:5-23, Feb. 19, 2013).

[50] *See, e.g.,* R. Doc. 91, Ex. 1 (Larry Taylor Dep., 101:18 - 102:23, Oct. 23, 2012); R. Doc. 91, Ex. 6 (Blaine Ockerman Dep., 120:14- 122:22, 178:6-179:7, Jan. 7, 2013); R. Doc. 91, Ex. 7 (Greg Irby Dep., 117:4 -11, Jan. 8, 2013).

[51] *See, e.g.,* R. Doc. 109, Ex. C (Ed Dee Dep., 88:1 -10, 109:5 -110:12, Dec. 11, 2012).

Because genuine issues of fact exist with respect to two elements of the alternative design claim against Signal regarding the ladle, the Court finds that Signal is not entitled to judgment as a matter of law that Plaintiff has no alternative design claim against Signal. Accordingly, to the extent Signal's motion for summary judgment seeks judgment as a matter of law that the alternative design claim asserted regarding the ladle must fail, Signal's motion is denied.

> ### B.   Signal is Not Entitled to Summary Judgment on its Lack of Feasibility Affirmative Defense to Plaintiff's Alternative Design Claim

Signal spends the majority of its motion for summary judgment arguing that Plaintiff's alternative design claim with respect to the ladle must fail because she cannot show it was "feasible" for Signal to install or implement AGC technology or ladle lids at the time the ladles left Signal's control.  Lack of feasibility is an affirmative defense for the manufacturer, and does not become relevant unless and until the plaintiff establishes the three elements of her alternative design claim under § 9:2800.56. *Sisk*, 959 F. Supp. at 339. Louisiana Revised Statute 9:2800.59 defines the lack of feasibility affirmative defense as follows:

> Notwithstanding R.S. 9:2800.56, a manufacturer of a product shall not be liable for damage proximately caused by a characteristic of the product's design if the manufacturer proves that, at the time the product left his control:
>
> ***
>
> (3)   The alternative design identified by the claimant under R.S. 9:2800.56(1) was not feasible, in light of then-existing reasonably available scientific and technological knowledge or then-existing economic practicality.

LA. REV. STAT. ANN. § 9:2800.59.  While the burden of proving this affirmative defense at

trial lies with Signal, the material facts with respect to Signal's lack of feasibility affirmative defense (i.e., the economic and practical feasibility of installing alternative technologies) are essentially the same as the material facts with respect to the risk-utility balancing test element of Plaintiff's alternative design claim.   Those material facts relevant to both inquiries are in dispute.   As a result, summary judgment on the risk-utility balancing test element of Plaintiff's claim is inappropriate, as is summary judgment on Signal's lack of feasibility affirmative defense.

Accordingly, to the extent Signal's motion for summary judgment seeks judgment as a matter of law on its lack of feasibility affirmative defense, Signal's motion is denied.[52]

### C.   Signal is Not Entitled to Summary Judgment on its Sophisticated User Defense to Plaintiff's Inadequate Warning Claim

Signal does not argue that it gave Bayou Steel or ArcelorMittal an adequate warning regarding the dangers of using a ladle without AGC technology and/or a lid.   Indeed, it is undisputed that Signal did not give any warning whatsoever. Instead, Signal argues, as did Siemens, that it had no duty to warn of those dangers in the first place because Bayou Steel, and later ArcelorMittal, were sophisticated users who knew or reasonably should have been

---

[52] The Court notes for the record that it considered Signal's argument that Bayou Steel's decision not to order ladles with AGC technology and/or lids relieves Signal of liability for damages caused by the ladle.   Essentially, Signal is presenting another affirmative defense in addition to its lack of feasibility defense; that is, that a manufacturer may not be held liable for damages caused by its product when the customer knowingly rejected a safer design.   In *Perez I*, Judge Duval addressed this very issue and held that such an affirmative defense does not exist under the LPLA.   1999 WL 527734, at *5-6; *see also Perez v. Michael Weinig, Inc.*, 04-448, 2005 WL 1630018, at *4-6 (W.D. La. July 7, 2005) ("*Perez II*") (adopting Judge Duval's reasoning and reaffirming that "allowing manufacturers to escape liability for injuries to third parties where a purchaser is willing to buy an unsafe product despite an available safer alternative" is not an affirmative defense under the LPLA).   Judge Duval noted, however, the fact that the customer chose a less expensive, less safe design "may have considerable evidentiary use at trial" in relation to the risk-utility balancing test.   *Perez I*, 1999 WL 527734, at *5-6.   Signal is free to present evidence at trial that it offered Bayou Steel AGC technology and/or ladle lids and that Bayou Steel rejected that offer.   Because the facts relating to this issue are disputed, however, this argument does not support Signal's request for summary judgment.

expected to know that manual coupling technology and lidless ladles were dangerous characteristics of the ladles Signal produced for Bayou steel. As explained above, this is an affirmative defense for the manufacturer.

Before addressing Signal's affirmative defense, the Court addresses Signal's argument that Plaintiff cannot sustain her inadequate warning claim because she does not have a "warnings" expert.  Even assuming Plaintiff's liability expert is precluded from offering expert testimony with respect to Plaintiff's inadequate warning claim,[53] this argument is misplaced for three reasons.  First, expert testimony is not required for a successful inadequate warning claim under the LPLA.  *See, e.g., Calvit v. Procter & Gamble Mfg. Co.*, 207 F. Supp. 2d 527, 529 (M.D. La. 2002) (holding that even though warnings expert was excluded, question of adequacy of warning could be submitted to jury).  Second, Signal did not offer a warning in this case.  Plaintiff is not required to rely on expert testimony to satisfy her burden of proving that the ladle had dangerous characteristics and that Signal should have provided an adequate warning regarding those characteristics but failed to do so.  Third, the burden of proof with respect to Signal's sophisticated user affirmative defense is on Signal, not Plaintiff, so even if an expert would be helpful, Plaintiff is not required to have an expert on that issue.

The Court now turns to the question of whether Signal is entitled to summary judgment on its sophisticated user defense.[54]  The Court finds that Signal has not carried

---

[53] As explained earlier, Signal has a pending motion *in limine* regarding Plaintiff's liability expert Frank Dietrich.  Among other things, Signal argues that Mr. Dietrich should not be allowed to offer any expert testimony relating to Plaintiff's inadequate warning claim.  While the Court has not yet ruled on that motion, for purposes of this discussion, whether Plaintiff has a "warnings" expert is irrelevant.

[54] *See supra* section X.C.1 (discussion of applicable law and burdens of proof regarding the sophisticated user defense to an inadequate warning claim).

its burden of demonstrating that there are no genuine issues of material fact and that it is entitled to the protections of the sophisticated user defense as a matter of law.  Whether Bayou Steel knew or should have known that using ladles without lids and ladles not equipped with AGC technology was less safe than ladles equipped with these technologies, or that the decision to use products without these technologies could cause harm, is disputed.   Indeed, as explained in the context of Siemens' motion, the evidence demonstrates that, while Bayou Steel was aware of the potential danger for ladle eruptions in general, and while it is undisputed that Bayou Steel was specifically aware of the concepts of ladle lids and AGC technology,[55] Bayou Steel may not have known using lids without ladles or AGC technology could cause a fatal accident.[56]  There also are disputed issues of fact with respect to whether Bayou Steel had "vast knowledge" of the risks and benefits associated with these alternative technologies on its ladles.  Likewise, while it seems clear that Signal recognized at all times relevant to this case the potential dangers of using ladles without AGC technology and/or lids, it is not clear whether ArcelorMittal also knew or should have known of these dangers.  Thus, it is unclear whether Signal had a continuing duty to warn ArcelorMittal of these dangers after ArcelorMittal bought the plant in 2008.

Because reasonable minds could differ on the question of whether Bayou Steel and/or ArcelorMittal knew or should have known of these dangers, the question of whether Signal is entitled to the protection of the sophisticated user affirmative defense must be resolved by the jury after trial.  *Swope*, 281 F.3d at 206.  Accordingly, to the extent Signal's

---

[55] *See* R. Doc. 102 at ¶¶ 33, 43.  Plaintiff admits these facts.  *See* R. Doc. 135.

[56] *See* R. Doc. 91, Ex. 2 (Larry Taylor Dep., 45:11 - 46:13, 100:19-102:23, 123:21 - 124:14, 129:14-20, 130:1-17, Oct. 23, 2012).

motion for summary judgment seeks judgment as a matter of law on its sophisticated user defense, the motion is denied.

### CONCLUSION

For all the reasons set forth herein, **IT IS ORDERED** that the motions for summary judgment filed by Siemens and Signal be and hereby are **DENIED** in their entireties.

**New Orleans, Louisiana, this** <u>28th</u> **day of June, 2013.**

_____

**SUSIE MORGAN
UNITED STATES DISTRICT JUDGE**

35