UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROXANNE MOYER, INDIVIDUALLY | * | CIVIL ACTION NO: 2:11-3185 |
| AND ON BEHALF OF HER DECEDENT | * | |
| HUSBAND, SAMUEL N. MOYER | * | SECTION: E |
| | * | |
| VERSUS | * | MAGISTRATE DIV.: 2 |
| | * | |
| SIEMENS VAI SERVICES, L.L.C, | * | |
| SIGNAL METAL INDUSTRIES, INC., | * | JURY TRIAL REQUESTED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S TRIAL MEMORANDUM**

Now comes the Plaintiff Roxanne Moyer, through undersigned counsel, who submits this trial memorandum of law concerning two legal issues that Plaintiff anticipates will be raised at trial based on the evidence.

**I.  Admissibility of photographs, drawings, and other documents depicting post-accident improvements for limited evidentiary purposes.**

At trial, Plaintiff intends to offer a number of documents to establish her design defect claims under the LPLA.  Specifically, Plaintiff must proffer alternative designs that would have prevented Mr. Moyer's damages and show that these designs existed at the time each product left the Defendants' control.  In addition, Plaintiff must defend against Siemens' and Signal Metals' attack that the alternative designs were not feasible at the time the products at issue in this case left their respective control.

Plaintiff's documentary evidence depicting the alternative designs she will proffer at trial are found in the Court's Exhibit Bench Book.  Specifically, Plaintiff will offer Drawings (Exhibit

1

62), Engineering Diagrams (Exhibits 78-83), and Photographs (Exhibits 90-91) that illustrate alternative ladle and ladle transfer car designs that include automatic gas coupling technology.

These documents, however, depict post-accident improvements made by ArcelorMittal as a result of Mr. Moyer's fatality. Plaintiff does *not* seek to introduce these documents for the purpose of showing that post-accident improvements were made at the plant. Rather, these documents are relevant and admissible *for the limited purpose* of establishing Plaintiff's LPLA claims, i.e. existence of alternative designs, feasibility, and causation. To be clear, Plaintiff contends that any evidence or testimony that what is depicted in the drawings, diagrams, and photographs was actually installed in the plant would be irrelevant and inadmissible under Rules 401 and 403 of the Federal Rules.

Rule 407 of the Federal Rules of Civil Procedure excludes from evidence subsequent remedial measures such as post-accident safety improvements. Rule 407 states: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:

- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures."[1]

However, the Fifth Circuit has held that in "product liability cases involving the issue of defective design"… "evidence of subsequent changes by third parties is properly excludable

---

[1] FED. R. EVID. 407.

2

because of its tendency to confuse the jury by diverting its attention from whether the product was defective at the relevant time [i.e. the time of manufacture] to what was done later."[2]

Therefore, Rule 407, on its own, would not exclude evidence that auto coupling technology and shielding was actually installed post-accident.  Nonetheless, for evidence of post-accident safety improvements to be admissible it still must clear the relevancy hurdles of Rules 401 and 403.[3]

In the present case, the mere fact that ArcelorMittal Laplace implemented shielding and auto coupling technology post-accident is not relevant to any claim or defense in this case.  The pertinent focal point in LPLA cases is whether the alternative designs existed and were feasible *at the time the product's left the Defendants' control, not whether those alternative designs were implemented post-accident.*[4] The probative value of any evidence of post-accident safety improvements is therefore extremely low or non-existent.  Such evidence only has the potential to mislead the jury and cause confusion and prejudice, which is forbidden under Rule 403's balancing test.[5]  The mere fact of a design change will distract the jury from the real inquiry which is whether the design of the stir platform, ladle, and ladle cars were defective in design.[6]

What the Fifth Circuit said in *Grenada Steel Industries, Inc.* is important:

> "The real question is whether the product or its design was defective at the time the product was sold.... The jury's attention should be directed to whether the product was reasonably safe at the time it was manufactured. In this case, for example, there was ample expert testimony concerning that very point. The introduction of evidence about subsequent changes in the product or its design

---

[2] *Middleton v. Harris Press & Shear, Inc.*, 796 F.2d 747, 752 (5th Cir.1986) (emphasis added); See also, *Grenada Steel Industries v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir. 1983); *Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221, 1230 (5th Cir. 1984).
[3] *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 732 (N.D. Ill. 2009); *Dixon v. International Harvester,* 754 F.2d 573,  583 (5th Cir. 1985.)
[4] See *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 710 (N.D. Ill. 2009) (stating "such evidence also distracts the jury from the relevant time frame for its inquiry, *i.e.,* whether the product was defective at the time of manufacture and sale)*; Raymond v. Raymond Corp.,* 938 F.2d 1518, 1522-1523 (1st Cir.1991).
[5] *Thakore,* 670 F.Supp.2d at 732.
[6] *See Id*. at 734.

3

threatens to confuse the jury by diverting its attention from whether the product was defective at the relevant time to what was done later....(addressing only product design). Interpreted to require the evidence to focus on the time when the product was sold, Rule 407 would conform to the policy expressed in Rule 403, the exclusion of relevant information if its probative value is substantially outweighed by the danger of confusion...."[7]

On the other hand, the Drawings (Exhibit 62), Engineering Diagrams (Exhibits 78-83), and Photographs (Exhibits 90-91) are relevant, probative, and admissible for the limited purpose of depicting and portraying the alternative designs, i.e. auto coupling and shielding, the feasibility of implementing those designs, and causation. **Introduction of these Exhibits does not require that the jury be told that these designs were actually implemented at the plant.**

Under Rule 401, evidence is relevant if it has *any tendency* to make a fact of consequence more or less probable than it would be without the evidence.[8] In addition the Federal Rules contemplate that evidence may be properly admitted for one purpose and not another.[9]

Here, context is key. The exhibits offered by Plaintiff will *not* be offered in a context that mentions that these alternative designs were actually installed post-accident. Such evidence would be irrelevant as discussed above. Rather, the documents are probative on the following issues: 1) identifying and depicting the alternative designs; 2) the feasibility of adopting these designs at the time the product's left the defendant's control, and 3) the adverse effect if any that the alternative designs might have on the utility of the ladle, ladle car, and stir platform.

Therefore, the Drawings (Exhibit 62), Engineering Diagrams (Exhibits 78-83), and Photographs (Exhibits 90-91) are relevant, probative, and admissible.

---

[7] *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 735 (N.D. Ill. 2009) (quoting *Grenada Steel Industries, Inc. v. Alabama Oxygen Co., Inc.,* 695 F.2d 883, 888-889 (5th Cir.1983))
[8] FED R. EVID. 401.
[9] FED R. EVID. 105.

### II.     The relationship between ArcelorMittal USA (LCNA) and ArcelorMittal Laplace and parent/subsidiary company liability.

ArcelorMittal USA (LCNA[10]) is the parent company of its subsidiary ArcelorMittal Laplace L.L.C., the steel mill where the subject accident occurred on February 1, 2011.  Both entities are non-parties in the present litigation.  However, to include both entities on the verdict form as potential tortfeasors, particularly on the apportionment of fault sections, the Court must determine whether ArcelorMittal USA's activities with regard to work place safety rose to the level for which they can be included as a tortfeasor.

While generally a parent corporation, by virtue of its own ownership interest, has the right, power, and ability to control its subsidiary, a parent corporation generally has no duty to control the actions of its subsidiary and thus no liability for a failure to control the actions of its subsidiary.[11]  Louisiana courts have declared that the strong policy of Louisiana is to favor the recognition of the corporation's separate existence, so that veil-piercing is an extraordinary remedy, to be granted only rarely.[12]

**Importantly, "the parent-shareholder is not responsible for the working conditions of its subsidiary's employees merely on the basis of parent-subsidiary relationship.**"[13]  A parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary."[14]  In determining whether a parent corporation affirmatively undertook the duty of safety owed by its subsidiary, courts have looked to the scope of the parent's involvement, the extent of the parent's

---

[10] "Long Carbon North America"
[11] *Bujol v. Entergy Services, Inc.,* 922 So. 2d 1113, 1127-28 (La. 2004).
[12] *Id.* at 1128 citing Glenn G. Morris and Wendell H. Holmes, *Louisiana Civil Law Treatise, Vol. 8, Business Organizations* (1999), § 32.02, p. 55.
[13] *Id.* at 1132.  See *Love v. Flour Mills of America*, 647 F.2d 1058, 1063 (10th Cir.1981).
[14] *Love, [supra]; see also* Treece & Zuckerman, *A Parent Corporation's Liability for the Torts of its Subsidiary in the Context of Exclusive Remedy Provision of the Workers' Compensation Laws,* 50 Ins. Counsel J. 609, 613-15 (1983).

authority, and the underlying intent of the parent to determine whether the parent corporation affirmatively undertook the duty owed by the subsidiary.[15]

However, a parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment; **communication or concern over safety matters is not enough**.[16]

Other courts have held that it is <u>not</u> proof of an affirmative "undertaking" to show merely that a parent: (1) hired the safety director to work for the subsidiary; (2) assisted a subsidiary in "evaluating and inspecting the safety conditions" at the subsidiary's plant; or (3) conducted a negligent inspection.[17]

"Neither a parent's concern with safety conditions and its general communications with the subsidiary regarding safety matters, nor its superior knowledge and expertise regarding safety issues, will create in the parent corporation a duty to guarantee a safe working environment for its subsidiary's employees."[18] "The majority of cases that have held that a parent, or other entity, will only be liable for a voluntary assumption of duty under § 324A(b) where the corporation's undertaking was intended to supplant, not just supplement, the subsidiary's duty."[19]

In *Bujol v. Entergy Service Inc.*, 922 So.2d 1113 (La. 2004), the Louisiana Supreme Court reviewed a trial court decision in which the jury concluded that a parent company, Air Liquide S.A. ["ALSA"] assumed the duty for the safety of a plant owned by a subsidiary

---

[15] *Muniz v. National Can Corp.*, 737 F.2d 145, 148 (1st Cir.1984); *Bujol v. Entergy Servs., Inc.*, 2003-0492 (La. 5/25/04), 922 So. 2d 1113, 1131-1132.
[16] *Bujol*, 922 So.2d at 1131-1132.
[17] *Muniz v. National Can Corp.*, 737 F.2d 145, 148 (1st Cir.1984); *Bujol v. Entergy Servs., Inc.*, 2003-0492 (La. 5/25/04), 922 So. 2d 1113, 1132.
[18] *Bujol v. Entergy Servs., Inc.*, 2003-0492 (La. 5/25/04), 922 So. 2d 1133.
[19] *Id.* at 1136; Section 324 of the Restatement (Second) of Torts.

company, Air Liquide American Corporation ["ALAC"].[20] The Louisiana Supreme Court reversed the jury's finding that the parent company ALSA assumed the duty for safety at ALAC's plant.[21]

In *Bujol*, Claude Tronchon, the General Manager of Risk Management for ALSA at the time of trial and the CEO of ALAC from 1991-1993, testified that the general managers of each subsidiary all around the world have the full responsibility for safety at their respective subsidiaries.[22] He clarified that ALSA does not do technical safety audits, that each subsidiary does their own safety audits, and that ALSA audits each subsidiary only to see that they have rules and procedures in place which insures that safety is managed in the subsidiary.[23]

In determining that ALSA did not assume the duty for safety at ALAC, the Louisiana Supreme Court in *Bujol* reasoned:

> [A]s a matter of general corporate law, ALSA had no duty as a parent corporation to control the activities of any of its subsidiaries, to insure that its subsidiaries were complying with their duty to provide a reasonably safe place to work, nor any independent duty to notify its subsidiaries of any safety recommendations.[27] Because of these well-established legal rules by which employers and corporations are governed, we will not "lightly assume" that a parent corporation has agreed to accept the subsidiary-employer's duty to provide a safe workplace absent proof of an affirmative undertaking of that duty by the parent corporation. As the above cited cases hold, neither a parent's concern with safety conditions and its general communications with the subsidiary regarding safety matters, nor its superior knowledge and expertise regarding safety issues, will create in the parent corporation a duty to guarantee a safe working environment for its subsidiary's employees under § 324A.[24]

In the present case, the Court will be called up to determine whether the evidence at trial supports the proposition that Arcelor Mittal USA, through its Chief Technology Officer Gary

---

[20] *Bujol*, 922 So.2d at 1119.
[21] *Id*.
[22] *Id*. at 1123.
[23] *Id*. at 1124.
[24] *Bujol v. Entergy Servs., Inc.*, 2003-0492 (La. 5/25/04), 922 So. 2d 1113, 1133.

Lefko, assumed the duty over workplace safety at the ArcelorMittal Laplace facility, such that ArcelorMittal USA should be listed on the verdict form as a potential tortfeasor.

Plaintiff expects that the evidence at trial will clearly show that ArcelorMittal Laplace, through its Health and Safety Department led by Blaine Ockerman and Wendy Stehling, retained almost exclusive control over the implementation of all workplace safety measures at the Laplace facility. While the parent company Arcelor Mittal USA does play a role in communicating safety initiatives, full responsibility for enacting those initiatives and conducting daily safety assessments belongs to ArcelorMittal Laplace.

At trial, the following witness testimony will be pertinent to whether ArcelorMittal USA assumed the duty for workplace safety in Laplace: Gary Lefko, Blaine Ockermann, and Wendy Stahling.

Respectfully submitted,

**DAVIS, SAUNDERS & MILLER, PLC**

/s/ *Joseph M. Miller*

**JOSEPH M. MILLER (#30636)**
**BENJAMIN B. SAUNDERS (#11733)**
**CARISA GERMAN-ODEN (#31463)**
400 Mariners Plaza Drive, Suite 401
Mandeville, LA 70448
Telephone:   (985) 612-3070
Facsimile:   (985)612-3072
**Attorneys for Plaintiff, Roxanne Moyer et al.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of June 2013, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of filing to counsel of record.

/s/ *Joseph M. Miller*

**JOSEPH M. MILLER**